TEXAS MEDICAL ASSOCIATION, a
nonprofit corporation, et al.,
Plaintiffs,

v.

F. David MATHEWS, in his Official Ca-
pacity as Secretary of the Department
of Health, Education and Welfare of
The United States of America, De-
fendant.

Civ. A. No. A–74–CA–102.

United States District Court,
W. D. Texas,
Austin Division.

Jan. 9, 1976.

Jack D. Maroney and Will G. Barber, Brown, Maroney, Rose, Baker & Barber, Philip R. Overton, Austin, Tex., for plaintiffs.

Henry Valdespino, Asst. U. S. Atty., San Antonio, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER

ROBERTS, District Judge.

As this litigation now stands,[1] the ultimate issue remaining to be decided by the Court is whether certain regulations promulgated by the Defendant Secretary of the Department of Health, Education and Welfare (HEW) under the Professional Standards Review Organizations (PSRO) statute of 1972,[2] 42 C.F.R. 101.-2(e) and 101.48, whereby HEW has divided the State of Texas into nine PSRO areas and rejected Plaintiffs' proposal of a single statewide PSRO, including area designation, for Texas, should be held unlawful and set aside by this Court under 5 U.S.C. § 706(2)(A). The scope of judicial review prescribed in § 706(2)(A) is as follows:

"The reviewing court shall—

* * * * * *

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

* * * "

Plaintiffs' pleadings and proof attack the HEW regulations in question not only on the basis of being "arbitrary/capricious" and an "abuse of discretion" relative to the subject matter thereof, but also on the additional ground of being "otherwise not in accordance with law," in that HEW's action was allegedly based, in part, on pressures emanating from Congressional sources. This latter ground raises, under the trial record developed in this case, a mixed question of

1. Plaintiffs' complaint states two causes of action. Plaintiffs' challenge to the constitutionality of the PSRO legislation has previously been dismissed by order of this court granting, in part, Defendant's Motion for Judgment on the Pleadings or in the Alternative for Summary Judgment. That decision was made in reliance on the decision of a three-judge district court for the Northern District of Illinois in *Association of American Physicians and Surgeons v. Weinberger*, 395 F.Supp. 125 (N.D.Ill. 1975). That decision has subsequently been affirmed by the Supreme Court of the United States, at —— U.S. ——, 96 S.Ct. 388, 46 L.Ed.2d 299, 44 U.S.L.W. 3304, (1975). Plaintiff's alternative claim, relating to the alleged invalidity of certain PSRO regulations promulgated by the Secretary of HEW, has now been tried by the Court and is ruled upon in this Memorandum Opinion and Order.

2. Section 249 F of Title II of the Social Security Amendments of 1972, 42 U.S.C. 1320c et seq.

law and fact involving a matter of credibility to be resolved by the Court.

The generally applicable standards of § 706(2)(A) judicial review are the same for both of Plaintiffs' contentions. The reviewing court is required to engage in a substantial inquiry and a thorough, probing, in-depth review, which does not end with a determination that the administrative agency has acted within the scope of its statutory authority. Where, as here, there is no formal contemporaneous administrative record and findings, the court may require, as the court has done in this instance, the administrative officials who participated in the decision-making to give testimony explaining their action. Indeed, in situations like the one at hand, the only way that there can be effective judicial review under § 706(2)(A) is by examining the decision-makers themselves. In these regards this Court has followed the authoritative guidance of *Citizens to Preserve Overton Park, Inc. v. Volpe, Secretary of Department of Transportation,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

*Overton Park* sets forth plainly what is meant by the terms "arbitrary/capricious" and "abuse of discretion" as used in § 706(2)(A). In making a finding with respect thereto the reviewing court must consider whether the agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the reviewing court is not empowered to substitute its judgment for that of the agency. To the same effect is the articulation of the reviewing court's role to be found in *Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 383, 444 F.2d 841, 850–852 (1970). In rather practical terms the D. C. Circuit there says that the reviewing court is called on to set aside the agency's action if it concludes that the agency has not actually taken a hard look at the salient problems and has not genuinely engaged in reasoned decision-making.

Turning now to the other dimensions of § 706(2)(A) review presented by Plaintiffs' pleadings and proof in this case—i. e. that the challenged regulations are unlawful as being "otherwise not in accordance with law" in that they are based, in part, on pressures emanating from Congressional sources—the leading case on this point is *D. C. Federation of Civic Ass'ns v. Volpe, Secretary of Department of Transportation,* 148 U.S. App.D.C. 207, 459 F.2d 1231 (1971). There the Defendant Secretary's approval of construction of the "Three Sisters Bridge" across the Potomac River between Virginia and the District of Columbia was reversed, and the matter was remanded to the Secretary for him to reperform his statutory responsibilities in accordance with the court's majority opinion. In pertinent part for purposes at hand, Judge Bazelon wrote:

. . . As the District Court pointed out,

"(t)here is no question that the evidence indicates that strong political pressure was applied by certain members of Congress in order to secure approval of the bridge project."

. . .

The author of this opinion is convinced that the impact of this pressure is sufficient, standing alone, to invalidate the Secretary's action. Even if the Secretary had taken every formal step required by every applicable statutory provision, reversal would be required, in my opinion, because extraneous pressure intruded into the calculus of considerations on which the Secretary's decision was based. . . ."

The Secretary's testimony indicated, as the court below pointed out, that "his decision was based on the merits of the project and not solely on the extraneous political pressures."

Notwithstanding these findings of fact, the (trial) Court determined as a matter of law that since the Secretary was not acting in a judicial or quasi-judicial capacity, his decision would be invalid only if based solely on these extraneous considerations. I cannot

accept that formulation of the applicable legal principle. While Judge Fahy is not entirely convinced that the District Court ultimately found as a fact that the extraneous pressure had influenced the Secretary's decision—a point which is for me clear—he has authorized me to note his concurrence in my discussion of the controlling principle of law: namely, that the decision would be invalid if based in whole or in part on the pressures emanating from Representative Natcher. Judge Fahy agrees, and we therefore hold, that on remand the Secretary must make new determinations based strictly on the merits and completely without regard to any considerations not made relevant by Congress in the applicable statutes.

\* \* \* \* \* \*

To avoid any misconceptions about the nature of our holding, we emphasize that we have not found—nor, for that matter, have we sought—any suggestions of impropriety or illegality in the actions of Representative Natcher and others who strongly advocate the bridge. They are surely entitled to their own views on the need for the Three Sisters Bridge, and we indicate no opinion on their authority to exert pressure on Secretary Volpe. Nor do we mean to suggest that Secretary Volpe acted in bad faith or in deliberate disregard of his statutory responsibilities. He was placed, through the action of others, in an extremely treacherous position. Our holding is designed, if not to extricate him from that position, at least to enhance his ability to obey the statutory command notwithstanding the difficult position in which he was placed.

459 F.2d at 1245–46 and 1249

\* \* \* \* \* \*

By way of footnote the D. C. Circuit's opinion observes:

It might be argued that a remand would be futile here since the agency can only repeat the process it purports already to have undertaken: namely, considering the project solely on its merits. While we agree that a remand would be academic if the agency would inevitably arrive at the same result, *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766–767 n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969); Friendly, The "Limited Office" of the Chenery Decision, 21 Ad.L.Rev. 1, 5 (1968), it seems entirely possible that the agency could reach a different result if it could insulate itself from extraneous pressures unrelated to the merits of the question. On remand, the agency will have an opportunity to take steps to achieve the insulation required by statute and long-established principles of administrative law, perhaps by compiling a full-scale administrative record, utilizing fully intra-agency review procedures, and consulting with other agencies and planning groups.

459 F.2d at 1245–46 and 1249

The controlling principle of law thus enunciated in *D. C. Federation v. Volpe* is that agency action is invalid if based, even in part, on pressures emanating from Congressional sources. Through an array of administrative law precepts[3] reviewing courts are properly constrained from substituting their own judgment for that of the administrative agency. But those precepts presuppose that the judgment being thus protected is the agency's own legitimate judgment. Where pressures emanating from Con-

---

**3.** Such precepts include without limitation: " . . . the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Overton Park*, supra, 401 U.S. at 416, 91 S.Ct. at 824; "clear error of judgment" test, *Overton Park*, supra, 401 U.S. at 416, 91 S.Ct. 814; "presumption of regularity," *Overton Park*, supra, 401 U.S. at 415, 91 S.Ct. 814; "rational basis" concept, *Udall v. Washington, Virginia and Maryland Coach Company*, 130 U.S.App. D.C. 171, 398 F.2d 765, 769 (1968); "deference" due agency's construction/implementation of new statute, *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); "deference" due agency's expertise, *FPC v. Florida P. & L. Co.*, 404 U.S. 453, 463, 92 S.Ct. 637, 30 L.Ed.2d 600 (1972).

gressional sources have, in the words of *D. C. Federation v. Volpe*, "intruded into the calculus of considerations on which the Secretary's decision was based," then the resulting judgment is unlawful ab initio and not entitled to the sanctuary accorded untainted agency judgments.

■ Proceeding then to apply the *Volpe* principle of law to the case before this court, the legality of the entire HEW proceeding resulting in promulgation of the regulations dividing Texas into multiple PSRO areas and rejecting Plaintiffs' proposal of a single, statewide PSRO area designation for Texas depends upon whether or not HEW's action with respect thereto was based, in part, on pressures emanating from Congressional sources. The Court finds for the Plaintiffs on this point under the evidentiary record adduced at trial.

Plaintiffs' evidence is, for the most part, uncontroverted. It is uncontested that the proposal of Texas Institute for Medical Assessment (TIMA) of a single statewide PSRO, including area designation, was thoughtfully developed by competent and responsible representatives. The TIMA proposal had, and still has, an unprecedented unanimity of broadbased support among virtually all health deliverers in Texas.

It is also undisputed that HEW initiated a consultation process in July of 1973 to elicit input from the health care industry in Texas, including a public meeting in Dallas in August, 1973, which was attended by over 200 medical care provider representatives supporting the TIMA proposal, none of whom voiced any objection thereto or any support for any of the various multiple-PSRO area designations proposed by HEW. HEW manifested an intention to give weight to such local consultation process and recommendations resulting therefrom. In its report on the August meeting HEW's Region VI Office recommended a single, statewide PSRO area designation for Texas, noting that in its opinion the TIMA proposal had been developed thoughtfully and contained rather extensive justification for approval thereof. Among the considerations underlying this recommendation, which was based on adequate investigation, was that the Region VI Office concluded that the TIMA proposal had been fully rationalized and well thought out, was consistent with HEW's desire to get close to the "grass roots" people who know the local situation best, would be better costwise by having a strong centralized PSRO rather than multiple PSROs, and would provide an opportunity to implement PSRO quickly in Texas with strong physician participation and leadership. The TIMA proposal at all times envisioned actual performance of review activity at local levels of some 38 subareas, more or less, with suitable contractual assurances to HEW of fiscal accountability with respect to such subareas. No one with HEW has at any time questioned the good faith of the TIMA proposal and its representatives.

Also undisputed is the evidence relative to the National Professional Standards Review Council, a body created by the PSRO statute itself to advise HEW concerning administration of PSRO. After extensive consideration and discussion that Council adopted, in August 1973, an enabling resolution regarding single, statewide PSROs, including area designation, for "larger" states. The resolution provided that in any of these states where the professional associations concerned demonstrate a desire and capability of successfully sponsoring a state level PSRO, the option of a statewide area designation could be considered even though the 2500 physician general limit of HEW's PSRO area designation guidelines be exceeded, under which option the state level PSRO would contract directly with HEW to coordinate and administer all professional review functions within its purview, with the actual review performed locally throughout the designated area. The Council had been assured by HEW that great weight would be given its recommendations generally and that its recommendation on PSRO area designation was timely.

While the conclusion to be drawn from the following facts is sharply contested, neither the existence nor the timing of these facts has been materially controverted:

1. On October 14, 1973, the then national Director of HEW's Office of Professional Standards Review (OPSR) included the following policy statement in a speech delivered to a meeting of the American College of Surgeons in Chicago, Illinois:

> In addition, there are a few states with a larger number of physicians who have requested that they also be designated as a singlewide PSROs and have, in addition, obtained the backing of their medical, osteopathic, and hospital associations and in some instances their state governments. In such instances we will individually consider designation of the statewide PSRO if the statewide PSRO agrees to further subdivide itself in conformance with our guidelines, and if control of the review process remains at the local levels. * * * Thus, in states with a larger number of physicians which nevertheless opt for a statewide PSRO, it is clear that the review of care would be controlled and performed locally in pre-agreed upon subunits of the state, and that the statewide PSRO would be responsible for general administration, coordination, and support of the local review process.

2. On the morning of October 15, 1973, HEW's OPSR Director repeated this verbatim at a meeting of the National PSR Council as the policy statement "which will govern our activities." In the course of ensuing discussion regarding this policy statement, the State of Texas was used in hypothetical questions asked of the Director by council members, and the Director stated that "what we have tried to do here is live within the spirit of the law and also (the

National PSR Council's) strong recommendation at (its) last meeting that there should be flexibility in these instances where the states do want and can get general agreement on going as a whole"; and that he thought "the program will retain the local review and control that is appropriate and necessary . . . ." [4]

3. Before announcing this policy statement the OPSR Director had familiarized himself with the prior HEW staff and general counsel work product regarding PSRO area designations and had discussed the policy statement with HEW staff who opposed it as "inconsistent" with HEW's tentative PSRO area designation guidelines and the legislative "intent" underlying them. Notwithstanding this contrary advice, the OPSR Director elected to go forward with the policy statement on October 14/15th, which according to HEW trial testimony was within his authority to do.

4. Also according to the HEW trial testimony, at either the morning or noon intermission of the National PSR Council meeting of October 15th, HEW's general counsel informed the OPSR Director that, in his opinion also, such policy was not consistent with HEW's tentative guidelines and the "legislative intent" underlying them. Notwithstanding this additional counseling, the OPSR Director proceeded with distribution of copies of the policy statement at the Council's afternoon session on October 15th. As the Council's comments on such policy statement ended and that meeting was about to be adjourned, HEW's then Assistant Secretary for Health (the link in HEW's chain of command between the OPSR Director and the Secretary) addressed the Council members, saying that he wanted to make sure before they left that there were not any major problems that the Council saw with the OPSR Director's approach; that he wanted to be sure that "this made sense" as far as all

---

4. A copy of the original transcript of the National PSR Council's meeting on October 15, 1973, as furnished to Plaintiffs' counsel, was introduced at trial. At two places in this transcript there are pages missing which appear to have related to the October 15th policy statement. No explanation was tendered during trial with respect thereto.

or most of the Council members were concerned; that he wanted to be sure that "this represents a meeting of the Council in which we are all moving ahead generally with the same approach and understanding and general agreements"; and that " . . . we have got some major work to do on the Hill and so forth—that is where we are headed now—and (he wanted) to be sure that we speak as a group, as a unit, not that we speak one way and you speak another. So (he) just wanted to be sure of that."

5. On the night of October 15th the OPSR Director and TIMA's president talked by telephone. At trial TIMA's president testified that in the course thereof the Director read the foregoing policy statement to him and said, in substance, that the Texas problem had been solved, that Texas would get single, statewide PSRO, and that they would work out the details during his forthcoming trip to Dallas to confer with TIMA representatives. In his deposition testimony the Director did not remember saying this and ultimately denied the statement. However, under all the circumstances in evidence and the witnesses' respective demeanor, the Court finds that the TIMA president's testimony in this regard is the more credible.

6. Some forty-eight hours later, when the OPSR Director arrived in Dallas, Texas, for a conference with TIMA representatives on the night of October 17, 1973, the Director repudiated the October 14th/15th policy statement, reneged on his prior oral commitment that under such policy Texas would be designated a single, statewide PSRO area, announced that Texas must be divided into multiple PSRO areas, and gave HEW's Region VI Office orders to this effect. Testimony by TIMA's president (corroborated by two other Plaintiff witnesses and not denied by either of HEW's attending Region VI representatives) quoted the OPSR Director as remarking, in sub-

stance, that he had been up late the night before (October 16th) and into the early morning hours (October 17th) with Senator Bennett[5] and Mr. Constantine[6] thrashing this PSRO area designation matter out. Such a late October 16th/early October 17th meeting involving the OPSR Director and these Congressional sources did not surface in the course of Plaintiffs' deposition examination of the OPSR Director. However, HEW's only rebuttal witness at trial, a Washington-level HEW staff member, admitted that, while he was not present at such meeting, he can confirm that Senator Bennett expressed disapproval of the October 14/15th policy statement; that this was one of the "inputs" the OPSR Director had at that time; and that, although he was not aware of the above described remark by the OPSR Director to TIMA representatives on the night of October 17th, he would not dispute it.

7. Two TIMA representatives further testified that the following morning (October 18th), when they in effect asked the Region VI PSRO Representative about the abrupt turn about by the OPSR Director they were told in substance that he must either change his position or his job would be at stake. HEW's rebuttal witness testified that he could not dispute that the Region VI PSRO Representative said this, but he would not agree that this is what happened. The Region VI PSRO Representative himself was not called by Defendant HEW as a rebuttal witness. Again, under all the facts and circumstances presented in the trial record, including the Plaintiff witnesses' demeanor, the Court finds that such statement was in fact made by HEW's Region VI PSRO Representative, and the Court concludes that such statement, like those described hereinabove made by the OPSR Director to TIMA representatives, are admissible and probative under Rule 801(d)(2)(D), Federal Rules of Evidence.

---

**5.** Senator Wallace Bennett, sponsor of the PSRO legislation.

**6.** Mr. Jay Constantine, Senior Staff Member, Senate Finance Committee.

8. Two members of the National PSR Council were called by Plaintiffs as trial witnesses. Both had been active and vocal proponents of the Council's August resolution supporting a single, statewide PSRO area designation "option" for large states. Neither were at any time consulted, or given any explanation, by HEW personnel concerning the turn about with respect to the policy statement announced at the Council's October 15th meeting. Nor was the Council itself consulted or given any explanation with respect thereto at its next meeting in November 1973, by which time HEW had issued a contrary printed policy statement. Disturbed by this reversal of policy, one of these Council members later pursued the question of why the October 15th policy statement had been turned around to the point of posing that question to Senator Bennett and Mr. Constantine, in person. They responded that they had a position and they were not going to change it.

9. The HEW deposition testimony unequivocally establishes that the precipitous reversal of the October 14/15th policy statement was not brought about by anyone above the OPSR Director in HEW's chain of command; and that Texas was not thereafter seriously considered for single, statewide PSRO area designation by anyone with HEW.

10. It is to be noted that Plaintiffs' efforts to depose Mr. Constantine on matters material to this litigation were thwarted when he declined to answer all sensitive questions under the terms of a Senate resolution privilege.[7]

These facts and their chronology have lead the Court irresistibly, there being no persuasive countervailing evidence in the trial record, to the conclusion that HEW's essentially overnight turn around with respect to the October 14th/15th policy statement, the OPSR Director's repudiation of his oral commitment in favor of a single, statewide PSRO for Texas under such policy statement, and HEW's resulting regulations dividing Texas into multiple PSRO areas and rejecting the TIMA proposal all were based, at least in part, upon the herein described pressures emanating from Congressional sources. Reasonable minds could not find otherwise under the evidence in this case. The hierarchy level within HEW at which these pressures impacted was the very level at which the policy/decision-making at issue took place—the OPSR Director. While in a literal sense the ultimate responsibility for the HEW regulations in question was vested in the Secretary and his Assistant Secretary of Health, neither of them were actively involved in the PSRO area designation process. Theirs was a passive role of approval or disapproval of actions or proposed actions brought to them by or through HEW's OPSR Director. The evidence indicates that neither the Secretary nor his Assistant Secretary for Health ever exercised a disapproval veto as to any PSRO area designation action or proposed action favored by the OPSR Director.

While the above described pressures exerted on the OPSR Director on October 16/17th were in and of themselves a sufficient intrusion into the calculus of consideration on which the challenged HEW action was based to require invalidation thereof under *D. C. Federation v. Volpe* principles, there was proof of a pattern of undue influence by the same Congressional sources permeating HEW's entire administrative process relative to PSRO area designation for Texas. This included the following evidence:

a. Testimonial admissions by HEW personnel that, after passage of the

---

7. Senate Resolution No. 445, 93d Congress, 2d Session (Dec. 9, 1974). The protective part thereof reads: ". . . However, the said Jay Constantine shall respectfully decline to testify concerning any and all other matters that may be based on knowledge acquired by him in his official capacity either by reason of letters, records, correspondence, documents, communications, or other writings appearing in the files of the Senate or by virtue of conversations or communications with any person or persons relating to those duties."

PSRO statute in 1972 and prior to public dissemination in July 1973, of HEW's tentative guidelines for PSRO area designation, these Congressional sources had on their volition sought out HEW personnel involved in the formulation thereof and had conveyed Senator Bennett's own interpretation of "legislative intent" with respect to PSRO area designation; that these Congressional sources communicated such views to HEW during 1973 both through direct discussion and also through speeches and news releases; that HEW admittedly gave some consideration to this "input" from these Congressional sources in the formulation of its tentative guidelines, which were subsequently finalized, with only relatively minor changes, and published in the Federal Register;[8] and that these Congressional sources indicated to HEW their agreement with HEW's tentative guidelines before they were made public.

b. Uncontroverted testimony by a member of the National PSR Council that the 2500 number used in HEW's Guideline No. 5[9] as a maximum generally for the number of doctors in any one PSRO came from these Congressional sources.

c. Uncontradicted testimony by TIMA representatives that in the course of a visit with the OPSR Director and Assistant Secretary for Health in early October 1973, these HEW officials said that they were under terrific pressure from Senator Bennett not to exceed the 2500 guideline; that Senator Bennett was deeply involved in PSRO implementation; and that they looked to him as "our god" on PSRO matters.

d. Undisputed testimony by TIMA representatives that on a subsequent occasion several spokesmen for Texas osteopathic doctors conferred with the OPSR Director, who told them that he already had his orders against a single, statewide PSRO for Texas, and that he was not in a position to change those orders, he having made it quite plain that such orders came from Mr. Constantine; that

from the OPSR Director's office the osteopathic group went to Mr. Constantine's office, where they urged his acquiescence in a single, statewide PSRO for Texas; that during this conference Mr. Constantine indicated that he could and would get the PSRO statute amended to permit a single, statewide PSRO in Texas for the osteopathic profession if they would split away from TIMA; that he continually referred to organized medicine in a distasteful fashion; and that he made several derogatory remarks reflecting a very low opinion of the Texas Medical Association.

e. Undenied testimony that comparable hostility toward organized medicine in Texas was voiced by Mr. Constantine on other occasions.

f. Additional deposition admissions by responsible HEW personnel that during 1973 it was common knowledge through HEW's lines of communication that the staff of Senate Finance Committee was on HEW's backs with regard to area designation; that one could hardly enter into any conversation at Washington-level about PSRO area designation without having HEW personnel there talk about the pressures being applied by the Senate Finance Committee staff; that within HEW's own official ranks it was understood that Mr. Constantine had gotten involved in an unprecedented way in HEW's administration of PSRO and HEW's interpretation of "legislative intent" regarding PSRO; that Mr. Constantine's name became something of a household word within HEW regarding PSRO and was thrown around in various HEW staff conversations concerning PSRO; and that it was said within HEW, in substance, that Mr. Constantine was adamant that he would not permit HEW to enter into a single, statewide PSRO contract with Texas.

The foregoing statements on the part of HEW personnel are, as others hereinabove discussed, admissible and probative under Rule 801(d)(2)(D), Federal Rules of Evidence. Those by Mr. Con-

---

**8.** 42 C.F.R. 101.2(a–e)

**9.** 42 C.F.R. 101.2(e)

stantine are, under elementary hearsay concepts, admissible and probative to prove that such statements were in fact made by him and his state of mind relative thereto, as distinguished from proving the truth of the matter asserted in such statements. See Rules 801(c) and 803(3), Federal Rules of Evidence.

Plaintiffs have ferreted out this evidence reflecting a prima facie probability, if not certainty, that the HEW action at issue here was based, at least in part, upon pressures emanating from Congressional sources. In contrast the evidence presented by HEW to rebut Plaintiffs' proof on this critical point has been meager and unconvincing.

Through pleadings, discovery, and briefs on file HEW had plain and early forewarning that Plaintiffs were taking dead-aim at proving that the OPSR Director's "overnight" renunciation of the October 14/15th policy statement and application thereof to Texas was not only arbitrary and an abuse of discretion, but also was tainted by undue influence from Congressional sources (to wit, Senator Bennett and Mr. Constantine). Yet, Plaintiffs having introduced at trial corroborated testimony that on the night of October 17th the OPSR Director had, out of his own mouth, revealed a meeting with Senator Bennett and Mr. Constantine lasting into the early morning hours of that very day, wherein the PSRO area designation matter was thrashed out, HEW produced not a shred of evidence to refute that such a meeting actually happened. Furthermore, Plaintiffs having likewise placed in evidence corroborated testimony that the next day the word at HEW's Region VI Office, per its PSRO Representative who is still employed there, was that the OPSR Director's job was at stake unless he changed the October 14/15th policy statement, HEW closed its evidence without that HEW official or any witness denying that such statement was made. With respect thereto HEW's sole rebuttal witness did not dispute that the Region VI PSRO Representative said this, saying only that he would not agree that this is what happened. According-

ly, while the Court accepts the verity of Plaintiffs' proof in this regard on the strength of the Plaintiff witnesses' credibility and demeanor, the trial record is noticeably devoid of any appreciable evidence to the contrary.

The only explanation proffered at trial by HEW as to why the OPSR Director abruptly changed the October 14/15th policy statement was the following testimony by HEW's rebuttal witness (who had counselled the OPSR Director against such policy statement before the announcement thereof): "But, to sum it up, I believe the reason that he quickly reversed his decision was because of his conversation with (HEW's general counsel), which took place first at the intermission of the National Council meeting that Monday (October 15th)." The OPSR Director's deposition account of the content of that conversation was: "I wouldn't even say (that he was) critical of the statement. Our counsel informed me that that was not consistent with the criteria that were established (HEW's tentative guidelines) or the legislative intent." That explanation, in the Court's view, falls short of overcoming the thrust of Plaintiffs' proof. The recorded events of the Council's October 15th afternoon sessions, including comments thereat by the OPSR Director and his superior (Assistant Secretary for Health), are inherently inconsistent with HEW's thesis. Rather, those events bespeak consistency with Plaintiffs' position, as for example, when the Assistant Secretary for Health took time as the afternoon session concluded to stress the importance of being certain that HEW and the National PSR Council were speaking as one in view of the "major work" he and the OPSR Director had to do "on the Hill" where they were headed "now." Additionally, the glaring absence of any explanation by the OPSR Director to the National PSR Council itself, or to its two most prominent proponents of a large state "option" policy, weighs against believing that "advice of counsel" was the sole reason for the sudden reversal of policy, as does the unchallenged testimony that a National

PSR Council member's "why" pursuit culminated in a statement, in person, by Senator Bennett and Mr. Constantine that they had a position and they were not going to change it. Consequently, under all the evidence at hand the Court rejects the rebuttal reasoning and evidence advanced by HEW to the effect that reversal of the October 14/15th policy statement and its application to Texas was attributable solely to advice of HEW's counsel and/or staff.

Nor has HEW mounted any plausible counterattack with respect to Plaintiffs' evidence of a pattern of undue influence by the same Congressional sources, which not only had its inception during the formulative period of HEW's tentative guidelines, but also continued its existence and insidious effect throughout HEW's decision-making process regarding the Texas situation. As to this aspect of Plaintiffs' case, HEW would have this Court conclude that HEW's Guideline No. 5 and its preclusive application to Texas was based solely on HEW staff/counsel's own work product and not at all upon the quantum of input they admittedly received from Senator Bennett and Mr. Constantine. This Court finds against HEW's retrospective disclaimer of having been influenced by post-enactment communications from these Congressional sources.

■ HEW testimony conceded that some consideration was given to this external input; but HEW has sought to minimize the weight given thereto and to legitimatize the nature thereof. However, under *D. C. Federation v. Volpe* principles, the fact that an agency decision is a "little pregnant" with pressures emanating from Congressional sources is enough to require invalidation of the agency action. Especially should this be the law where, as here, the invasive Congressional source has financial leverage on the involved agency. Nor can this Court sanction that part of the "legislative intent" communicated, directly and indirectly, by Senator Bennett and Mr. Constantine to HEW consisting of their post-enactment interpolation of PSRO "legislative intent." Reason and caselaw alike forbid giving any legislative history weight at all to such post-enactment statements, regardless of the form or substance thereof. See *Schiaffo v. Helstoski,* 492 F.2d 413, 428 (3d Cir. 1974); *N. C. Freed Co. v. Bd. of Gov. of Fed. Res. Sys.,* 473 F.2d 1210, 1217 (2d Cir. 1973); *National School of Aeronautics v. U. S.,* 142 F.Supp. 933, 938, 135 Ct.Cl. 343 (1956).

Moreover, it seems to the Court quite likely that HEW's "own" interpretation of PSRO legislative history became, as a practical matter, inseparable from these Congressional sources' expression thereof. When the post-enactment views of Senator Bennett and Mr. Constantine are excised from HEW consideration, as they must be, neither the PSRO statute itself nor its legitimate legislative history can be soundly said to mandate division of Texas into multiple PSROs. Stripping away the "legislative intent" trappings generated by Senator Bennett and Mr. Constantine after PSRO passage, what remains does not reflect a legislative intent either for or against setting any maximum number of doctors for a PSRO area. The PSRO statute itself is silent as to any such maximum.[10] So also is its accompanying Senate Finance Committee Report.[11]

HEW does tout one pre-enactment statement by Senator Bennett on the Senate floor as reflective of a legislative mandate against administratively allowing a "large" State to "opt" for a single, statewide PSRO. However, that statement addresses an "average" doctor-size for PSROs, as foreseen by Senator Ben-

---

**10.** The two sections pointed to by HEW, 42 U.S.C. §§ 1320c–4(d) and 1320c–11, do not connote any legislative intent, pro or con, as to any maximum number of doctors for PSRO areas. These sections reflect merely an intent to encourage all practicing physicians in whatever PSRO area is designated to participate in review activities and to prescribe a Statewide PSR Council in whatever States are divided into 3 or more PSRO areas.

**11.** Senate Report No. 92–1230, 92d Congress, 2d Session (September 1972).

nett, which is patently distinguishable from a "maximum" doctor-size for a PSRO.[12] Moreover, such statements are to be viewed with appropriate perspective. "Rarely should a statement by an individual legislator be taken as final." *Schiaffo v. Helstoski,* 492 F.2d 413, 428 (3rd Cir. 1974).

To the foregoing legislative history [13] can be added the following commentary contained in a 1973 report of the same Senate Finance Committee:

It was anticipated that in smaller or more sparsely populated States PSRO area designations would be on a statewide basis. Authority to designate statewide areas was implied by the lack of a specific statutory prohibition against a statewide designation. The Committee amendment provides the Secretary with affirmative discretionary authority to designate these and other statewide PSRO areas.

In addition, the Committee does not believe that the decision as to whether to designate a statewide PSRO should be based solely upon application of an arbitrary limit based upon the number of physicians in the State. While the Committee reiterates that whatever feasible priority in designation of areas and in designation as PSRO's should be local, the amendment also prohibits the Secretary from barring consideration of designating an area on a statewide basis solely on account of the number of physicians in a given State. Of course, any such statewide organization seeking designation would have to satisfy other requirements including

those pertaining to capacity, acceptability to physicians, and objectivity.[14]

All factors considered, this Court is of the opinion that there is no reasonable basis in either the PSRO statute itself or its legitimate legislative history for ascribing thereto a mandate against a "large" state like Texas opting in good faith for a single, statewide PSRO, including area designation; that Senator Bennett and Mr. Constantine were mistaken in their post-enactment assertions otherwise; that HEW's personnel were, as a matter of law, in error in reasoning otherwise [15]; and that there is, in truth, simply no legislative intent either way as to any maximum doctor-number for PSRO areas.

In sum, Plaintiffs have proved to this Court's satisfaction, by whatever evidentiary standard measured, a case squarely controlled by *D. C. Federation v. Volpe,* and the Court finds all facts requisite thereto in Plaintiffs' favor on the basis of the entire trial record. The *Volpe* case teaches, and Congressional sources together with administrative agency personnel must learn, that good government under law cannot and will not tolerate the kind of external and extraneous pressure and influence that the evidentiary record here establishes were brought to bear upon HEW's PSRO administrative process by Senator Bennett and Mr. Constantine.

Having concluded that the relief herein granted is mandated by the principles of *D. C. Federation v. Volpe,* this Court will pretermit consideration of Plaintiffs' contention that the decision by HEW to

---

**12.** Congressional Record, page 16111 (Sept. 27, 1972).

**13.** See *Volkswagen of Am. v. U. S.,* 340 F.Supp. 983, 988 (U.S. Customs Ct.1972): "The determination of legislative intent from material issued after passage of the act in question can be permitted only in the most exceptional instances and with reference to clarification by the same Congressional Committee which considered the statute at the enactment. *Sioux Tribe of Indians v. United States,* 316 U.S. 317, 329, 62 S.Ct. 1095, 86 L.Ed. 1501 (1942)."

**14.** At page 67 of Senate Report No. 93–553, 93rd Congress, 1st Session (Nov. 21, 1973). "Report of the Committee on Finance, United States Senate, to Accompany H.R. 3153, to Amend the Social Security Act to Make Certain Technical and Conforming Changes."

**15.** Apart from the proven pressures and influences upon HEW by Senator Bennett and Mr. Constantine in terms of post-enactment expressions of legislative intent.

designate multiple PSROs in Texas must be struck down as "arbitrary, capricious, (or) an abuse of discretion" within the meaning of § 706(2)(A). This case will be remanded to the Secretary of Health, Education and Welfare for him to perform anew his statutory function of appropriate PSRO area designation for the State of Texas. As in *Volpe,* this Court's holding is designed to extricate HEW from the extremely treacherous position into which it was placed through the action of others, and to enhance its ability to implement the PSRO statute in Texas. While it could be cynically said that such a remand will be futile, since HEW can thereupon repeat a process it purports to have already undertaken, this Court has confidence in the administrative process involved here—once HEW has been freed from the inhibiting external influences that invaded its original decision-making as applied to Texas.[16] To this Court, as to the *Volpe* majority, it seems entirely possible that HEW could reach a different result if HEW can now insulate itself from the kind of external pressures that were brought to bear upon HEW in this instance by influential Congressional sources. On remand, HEW will have a fresh opportunity to take steps to achieve the desired insulation required by *Volpe* principles. Although a formal administrative record and findings are not required by the PSRO statute,[17] the Court here suggests, as did the *Volpe* majority, that HEW could best serve the interests of all concerned by developing and preserving, on remand, a full-scale administrative record to remove any doubts about the true basis of its forthcoming action. It is accordingly

Ordered, adjudged and decreed that 42 C.F.R. 101.48, designating nine PSRO areas in Texas, be, and hereby is declared to be unlawful and invalid and are hereby set aside as being not in accordance with law, within the meaning of 5 U.S.C. § 706(2)(A); that this matter be, and hereby is remanded to the Secretary of Health, Education and Welfare for further proceedings and appropriate action with respect to PSRO area designation for the State of Texas; and that Defendant be, and hereby is, enjoined from proceeding in any manner or to any extent with implementation of PSRO area designation in the State of Texas until the administrative process on remand has been fully and finally completed. This Memorandum Opinion and Order shall constitute findings of fact and conclusions of law.

---

**16.** The prospect that remand to HEW for realistic reconsideration, rather than an academic exercise arriving inevitably at the same result, is enhanced in this instance, as a practical matter, by the change of HEW personnel that has transpired.

**17.** As a consequence of which the familiar "substantial evidence" rule is inapplicable to this case. Compare 5 U.S.C. § 706(2)(E).