496 F.Supp. 716 (1980)
NATIONAL CENTER FOR PRESERVATION LAW, Preservation Society of Charleston, the Charlestown Neighborhood Association, and Harleston Village Association, Plaintiffs,
v.
Moon LANDRIEU, as Secretary of the Department of Housing and Urban Development, Robert T. Hall, as Assistant Secretary of Commerce and Administrator for Economic Development of the Economic Development Administration, Richard H. Jenrette, as Chairman, and David K. Wilson, as Vice Chairman of the Advisory Council on Historic Preservation, and Joseph P. Riley, Jr., as Mayor of the City of Charleston, South Carolina, a municipal corporation, Defendants.
Civ. A. No. 80-0781-1.
United States District Court, D. South Carolina, Charleston Division.
August 25, 1980.
*717 *718 *719 *720 Theodore L. Garrett, Patricia A. Barald, William M. Paul and David F. Williams, Covington & Burling, Washington, D. C., Mary Ann Marwick, Summerville, S. C., for plaintiffs.
Charlotte R. Bell, Land and Resources Division, Dept. of Justice, Washington, D. C., for Landrieu.
Marc L. Fleischaker and Charles R. Claxton, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., for Mayor Riley.
Heidi M. Solomon, Asst. U. S. Atty., Charleston, S. C., for Federal defendants.
William B. Regan and Alice F. Paylor, Charleston, S. C., for City of Charleston.

ORDER
HAWKINS, District Judge.
Plaintiffs, Preservation Society of Charleston, Charlestown Neighborhood Association and Harleston Village Association, seek to enjoin the City of Charleston from beginning construction of the Charleston Center Project to develop a hotel, convention center, parking facility and retail area in the old and historic district of Charleston. They further seek to enjoin the Department of Housing and Urban Development (HUD) and the Economic Development Administration (EDA) of the Department of Commerce from releasing federal grant money to the City.
Plaintiff Preservation Society of Charleston was organized in 1920 and incorporated under the laws of the State of South Carolina in 1928. The Preservation Society has approximately 2400 members, many of whom reside on property and/or work near the site of the proposed Charleston Center Project. (Compl., par. 4). Plaintiff Charlestown Neighborhood Association is a neighborhood organization comprised of some 800 individuals who reside and/or own property within a few blocks to the south of the proposed Charleston Center Project and within the old and historic district. (Compl., par. 5). Plaintiff Harleston Village Association is a neighborhood organization comprised of some 300 individuals who reside and/or own property within a few blocks to the west of the proposed Charleston Center Project and within the old and historic district. (Compl., par. 6). An original plaintiff to this action was the National Center for Preservation Law which was incorporated in 1978 under the laws of the State of New York as a nonprofit corporation devoted to architectural, *721 historical and neighborhood conservation. The Center is a public-interest law firm with its headquarters in New York City and offices in Washington, D.C., and San Francisco, California. Among the primary functions of the National Center are the dissemination of legal and technical advice to the public and to other preservation groups and the stimulation of public interest and debate concerning historic preservation issues. (Compl., par. 3; Exhibit "A" of Plfs. Memorandum in Opposition to Motion to Dismiss.)
Named as defendants are Joseph P. Riley, Jr., as Mayor of the City of Charleston, South Carolina, and four individuals who head federal agencies: Moon Landrieu, the Department of Housing and Urban Development (HUD); Robert T. Hall, the Economic Development Administration (EDA) of the Department of Commerce, and Richard H. Jenrette and David K. Wilson, the Advisory Council on Historic Preservation (Advisory Council).

DEVELOPMENT OF THE LITIGATION; THE RECORD
Plaintiffs filed their complaint in the United States District Court for the District of Columbia on February 25, 1980. In their complaint they stated that this action arises under 42 U.S.C. § 5301, et seq. (Housing and Community Development Act), 42 U.S.C. § 4321, et seq. (National Environmental Policy Act), 16 U.S.C. § 470, et seq. (National Historic Preservation Act), 42 U.S.C. § 3121, et seq. (Public Works and Economic Development Act of 1965), 5 U.S.C. § 701, et seq. (Administrative Procedure Act), and the federal regulations promulgated thereunder. It was further alleged in the complaint that jurisdiction is vested in the court under 28 U.S.C. §§ 1331 (federal question), 1346 (United States as defendant), 1361 (mandamus of federal officer), 2201 (declaratory judgment), and 2202 (further relief on declaratory judgment).
In Count I of their complaint the plaintiffs allege that HUD funding of the City of Charleston's portion of the Charleston Center Project violates the Housing and Community Development Act of 1974 (HCDA), 42 U.S.C. § 5301, et seq., and HUD's implementing regulations, 24 C.F.R. § 570.200, et seq. Plaintiffs contend that the project is ineligible for funding and that the City failed to meet certain Urban Development Action Grant program procedural requirements. Consequently, they assert that the approval by the Secretary of the HUD application was arbitrary, capricious, and in violation of federal law.
Plaintiffs allege in Count II of the complaint that the Secretary of HUD and the Administrator for Economic Development improperly delegated to the City of Charleston their environmental review responsibilities for the Charleston Center Project under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, et seq.
In Count III of the complaint the plaintiffs attack the adequacy of the EIS filed by the City of Charleston concerning the Charleston Center Project. The plaintiffs alleges that the EIS' failure to include certain necessary information is a violation of NEPA, 42 U.S.C. § 4321, et seq., and is not in compliance with the CEQ Guidelines contained in 40 C.F.R. Part 1500.
In Count IV of the complaint the plaintiffs contend that the Secretary of HUD and the Administrator for Economic Development improperly delegated to the City of Charleston their historical review responsibilities for the Charleston Center Project under the National Historic Preservation Act (NHPA), 16 U.S.C. § 470, et seq.
In Count V of the complaint the plaintiffs allege that the Secretary of HUD and the Administrator for Economic Development acted arbitrarily, capriciously, and in violation of federal law in executing the Memorandum of Agreement (MOA) concerning the Charleston Center Project.
In Count VI of the complaint the plaintiffs contend that the Advisory Council was never provided an opportunity to comment on the Charleston Center Project and its failure to comment was arbitrary, capricious, an abuse of discretion, and in violation of the NHPA. Further, they assert that the execution of the MOA by the Executive *722 Director of the Advisory Council is in violation of the NHPA and that the Vice Chairman of the Council failed to comply with the regulations of the Advisory Council in ratifying the MOA.
The plaintiffs seek, among other things, a declaration (1) that the HUD Urban Development Action Grant (UDAG) to the City was made for ineligible activities; (2) that HUD's and EDA's delegation to the City of certain responsibilities under the NEPA, 42 U.S.C. § 4321, et seq., the NHPA, 16 U.S.C. § 470, et seq., and Executive Order 11593, was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law; (3) that the execution of a Memorandum of Agreement by EDA, HUD, the City of Charleston and the Advisory Council was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law; and (4) that the City's EIS does not satisfy NEPA and the CEQ Guidelines and Regulations. The plaintiffs also seek to enjoin permanently EDA and HUD from releasing grant funds until they fulfill certain alleged responsibilities under NEPA, NHPA and Executive Order 11593, and to enjoin the City of Charleston from beginning construction of the Charleston Center Project.
On March 10, 1980, the federal defendants filed a motion for a change of venue pursuant to 28 U.S.C. § 1404. On that same day, the City of Charleston filed a motion to dismiss this action, or in the alternative to transfer it to the United States District Court for the District of South Carolina, Charleston Division. On April 25, 1980, the Honorable Harold H. Green, United States District Judge for the District of Columbia, entered an order pursuant to 28 U.S.C. § 1404(a) transferring this action to the United States District Court for the District of South Carolina. At that time, another case was pending before this court which involved essentially the same parties and which requested essentially the same declaratory relief. That case was entitled City of Charleston v. National Center for Preservation Law, et al., No. 80-0136-1, (hereinafter cited as City of Charleston).
On April 23, 1980, the plaintiffs filed two motions in the City of Charleston case: one for a temporary restraining order, and one for a preliminary injunction pursuant to Rule 65(a), Fed.R.Civ.P. A temporary restraining order was entered by this court on April 29, 1980, during a hearing with all parties present. That order temporarily enjoined the City of Charleston from condemning and/or demolishing any buildings on the proposed site of the Charleston Center. An order for a preliminary injunction was entered by this court on May 8, 1980, which enjoined the City of Charleston from demolishing any buildings located on the proposed site of the Charleston Center. On that same day, the plaintiffs in this case filed a motion for a preliminary injunction and, by order dated May 9, 1980, the court issued an identical preliminary injunction to the one previously issued in the City of Charleston case. The City of Charleston dismissed its case on May 9, 1980, by filing a notice of voluntary dismissal. Therefore, the only case which is pending before this court concerning the Charleston Center Project is the one presently under consideration.
All defendants answered on May 9, 1980, essentially denying the charging allegations of the plaintiffs' complaint. On May 15, 1980, the City of Charleston filed a motion to dismiss The National Center for Preservation Law as a plaintiff in this action pursuant to Rule 12(b)(6), Fed.R.Civ.P., for lack of standing. That motion, together with various discovery motions, was heard by this court on July 18, 1980, and was orally granted at that time.
On May 19, 1980, the plaintiffs served extensive interrogatories and requests for production of documents on both the City of Charleston and the federal defendants. The City of Charleston entered into a stipulation with the plaintiffs on June 26, 1980, agreeing to answer certain of the interrogatories and requests to produce. The City of Charleston later complied with their agreement and no further motion to compel has been filed by the plaintiffs against the City. The federal defendants refused to respond *723 to the interrogatories and requests to produce and sought a protective order from this court on June 4, 1980. At the hearing held on July 18, 1980, the plaintiffs stated that the purpose for seeking discovery against the federal defendants was to insure that the Administrative Record filed by the federal defendants was total and complete. Having satisfied itself from the certifications attached to the Administrative Records of EDA and the Advisory Council that their records were, in fact, complete, the court ordered the Secretary of HUD to determine if the Administrative Record filed with this court was the complete record of administrative decision-making by HUD in connection with the Charleston Center Project. On July 25, 1980, HUD complied with this court's order by filing a supplement to the Administrative Record and a certification that the Administrative Record with supplements was the complete record contained in the HUD files.
All defendants have filed motions for summary judgment, the City of Charleston having submitted its motion on June 10, 1980, and the federal defendants submitting theirs on June 25, 1980. The plaintiffs responded to the defendants' motions for summary judgment on August 12, 1980, and filed their motion for summary judgment at that time. A hearing was held on August 13, 1980, and all parties were afforded the opportunity to argue their motions for summary judgment.

THE PROPRIETY OF SUMMARY JUDGMENT
Rule 56, Fed.R.Civ.P., provides that summary judgment shall be granted where it is shown that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." There are essentially six major issues to be resolved: (1) whether HUD funding of the City of Charleston's portion of the Charleston Center Project violates the HCDA because the project is ineligible for funding and the City failed to meet certain UDAG program procedural requirements; (2) whether the Secretary of HUD and the Administrator of Economic Development improperly delegated to the City their environment review responsibilities for the Charleston Center under the NEPA; (3) whether the EIS is adequate; (4) whether the Secretary of HUD and the Administrator of Economic Development improperly delegated to the City their historical review responsibilities under the NHPA; (5) whether the Advisory Council followed its own procedures properly in executing the Memorandum of Agreement; and (6) whether the Administrator of Economic Development properly evaluated and reviewed the City of Charleston's EDA grant application.
In seeking summary judgment, the defendants rely upon the Administrative Records filed by the City of Charleston, the Department of Housing and Urban Development, the Advisory Council on Historic Preservation and the Economic Development Administration of the U.S. Department of Commerce. Contained in those Administrative Records are the Draft Environmental Impact Statement prepared on July 24, 1978, an addendum to the Draft Environmental Impact Statement prepared on January 8, 1979, the Final Environmental Impact Statement prepared June 1979, and the Supplement to the Final Environmental Impact Statement prepared on September 14, 1979. To oppose successfully the defendants' motions for summary judgment, it is incumbent upon the plaintiffs to meet the material relied upon by the defendants head-on and "set forth specific facts showing that there is a genuine issue for trial." Rule 56(e), Fed.R.Civ.P. See Atlantic States Const. Co. v. Robert E. Lee and Company, Inc., 406 F.2d 827 (4th Cir. 1969). Rule 56(e) provides inter alia:
When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, *724 if appropriate, shall be entered against him.

THE STANDARD OF REVIEW
The standard for judicial review of an administrative decision is determined by Section 706 of the Administrative Procedure Act, 5 U.S.C., as interpreted by the Supreme Court. In the case of Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the Supreme Court noted that the scope of review in this type of case was threefold. The first step in this process is one which requires the district court to decide whether the Secretary acted within the scope of his authority. The second step is a determination of whether or not the actual choice made by the Secretary was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. According to the Overton Park case, in order to make this finding, the Court must consider whether the decision was based on the consideration of the relevant factors and whether there has been a clear error of judgment. 401 U.S. at 416, 91 S.Ct. at 823. The Court further noted that, although the inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. Particularly, the district court is not empowered to substitute its judgment for that of the agency. Id. The third and final inquiry by the court is whether or not the Secretary's actions followed the necessary procedural requirement. Id. De novo review is unwarranted in this type of case since the court must focus on administrative action which was clearly documented prior to the start of the litigation. See Upper Westfork River Watershed v. Corps of Engineers, 414 F.Supp. 908, 916 (N.D. W.Va. 1976), aff'd, 556 F.2d 576 (4th Cir. 1976), cert. denied, 434 U.S. 1010, 98 S.Ct. 720, 54 L.Ed.2d 752 (1978).
The Fourth Circuit in Fayetteville Area Chamber of Commerce v. Volpe, 515 F.2d 1021 (4th Cir. 1975), stated that the focal point for judicial review should be the Administrative Record already in existence and not some new record made initially in the reviewing court. Id. at 1024, citing Camp v. Pitts, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). In the Fayetteville Chamber of Commerce case, the Fourth Circuit upheld the district court's denial of an evidentiary hearing since it determined that the Administrative Record disclosed all of the factors requiring consideration and that such factors were considered by the Secretary. In the case of Asarco, Inc. v. EPA, 616 F.2d 1153 (9th Cir. 1980), the Ninth Circuit Court of Appeals discussed in detail consideration of evidence outside of the Administrative Record. In that case the court noted that if an Administrative Record does not contain a satisfactory explanation of the federal agency's action, the court may require through affidavit or live testimony further explanations from the agencies involved.
In County of Suffolk v. Secretary of Interior, 562 F.2d 1368 (2d Cir. 1977), the Second Circuit Court of Appeals spoke of a "rule of reason" which a district court should utilize in reviewing a NEPA case involving an alleged inadequate Environmental Impact Statement. The court noted that a district court does not sit as a super agency empowered to substitute its scientific expertise or testimony presented to it de novo for the evidence received and considered by the agency which prepared the EIS. Id. at 1383. Rather, the court noted that the district court's task is to determine whether the EIS was compiled in objective good faith and whether the resulting statement would permit a decision-maker to fully consider and balance the environmental factors. Id. Once an agency has made a decision subject to NEPA procedural requirements, the only role for the court is to insure that the agency has considered the environmental consequences; it cannot interject itself within the area of discretion of the executive as to the choice of the action to be taken. Strycker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 227, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980), citing Kleppe v. Sierra Club, 427 U.S. 390, 410, n. 21, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976). In discussing a court's role of *725 reviewing an agency's decision subject to NEPA, the Supreme Court in Vermont Yankee Nuclear Power v. Natural Resources Defense Council, Inc., 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), stated:
It [NEPA] is to insure a fully informed and well-considered decision, not necessarily a decision the judges of the Court of Appeals or of this Court would have reached had they been members of the decision making unit of the agency. Administrative decisions should be set aside in this context, as in every other, only for substantial procedural or substantive reasons . . . not simply because the court is unhappy with the result reached.
Id. at 558, 98 S.Ct. at 1219.

FACTUAL BACKGROUND
The old and historic district of the City of Charleston, South Carolina, on the peninsula between the Ashley and Cooper Rivers, contains many historic homes and an old central business district. Charleston's old and historic district is included in the National Register of Historic Places established by 16 U.S.C. § 470. Since the early 1960's, the central business district has slowly deteriorated both physically and economically and the lack of long-term investment has caused an erosion of the City's tax base. Many of the buildings in the district which are of historic value have fallen into disrepair and have deteriorated. At the same time, the peninsula's low income and minority population has increased, generating greater demand for jobs and city services. (HUD A.R. Vol. 1, 125-28).
In an effort to revitalize downtown Charleston, the City Council in 1975 funded the Charleston Commercial Revitalization Program (CCRP) to recommend development projects which would revitalize the central city. This plan, which serves as the City's overall development plan, was compiled by a committee of city officials, preservationists, business people, realtors and residents. The CCRP concluded that, in order to insure that the central business district would survive and prosper, greater private investment in the area must be encouraged so that existing commercial markets could become reestablished and new businesses drawn to the district. To do so, the City determined to make major public improvements, such as parking and streetscape improvements, development of cultural facilities, infrastructure rehabilitation, and development of partially vacant sites as public-private joint ventures. (EDA A.R. A6-7, B1441).
One of the several economic development opportunities identified by the CCRP was a development on the vacant "Belk site" to link the declining commercial area on King Street with the expanding tourist trade of the Market district and to ease the deficiency in parking and hotel rooms occasioned by an increase in the city's tourist trade. This development on the Belk site, located between King and Meeting Streets and between Market and Hasell Streets in the central business district, was to contain a hotel, a parking garage, a convention facility, and retail space. (EDA A.R. A7, B1441). Based upon this proposal, the City conceived the Charleston Center Project consisting of a 350-room hotel, 450-car parking facility, and 60,000 square feet of convention and retail space. (City A.R. Vol. 12, 510).
The City, acting upon the advice contained in the CCRP, engaged consultants and architects to ascertain whether a project of the type envisioned in the CCRP was feasible for the Belk site. (Exhibit "A" to City's Memorandum in Opposition to Motion for a TRO and Preliminary Injunction). To help finance the Charleston Center Project, the City wrote to the area office of the Department of Housing and Urban Development in Columbia, South Carolina, on November 7, 1977, requesting that HUD determine if the City was eligible to apply for funds under the UDAG program. (HUD A.R. Vol. 1, 1). The HUD area office reviewed the City's request and this review revealed that the City met the eligibility requirements for UDAG funding. HUD subsequently informed the City on November 17, 1977, that it could submit its UDAG application. (HUD A.R. Vol. 1, 93). On January 30, 1978, the City submitted its *726 formal application for a $4.15 million UDAG grant to the HUD area office (HUD A.R. Vol. 1, 106-247).
Pursuant to Section 104(h) of HCDA, 24 C.F.R. Part 58, and the CEQ regulations, 40 C.F.R. Part 1500, the City, as the grant applicant, assumed the "lead agency" responsibility for environmental review and issued its Draft Environmental Impact Statement (DEIS) on July 24, 1978. The City issued an addendum to the DEIS on January 8, 1979. The Final Environmental Impact Statement (FEIS) and a supplement to the Final Environmental Impact Statement (SFEIS) were issued in June 1979 and on September 14, 1979, respectively. (EDA A.R. Part B; City A.R. Vols. 2-6). The SFEIS is the document that the City considers to be its Final EIS.
On August 31, 1978, the Supreme Court of South Carolina determined that the City of Charleston could not use its power of eminent domain to acquire land to be leased to a private developer for the Charleston Center Project. See Karesh v. City Council of Charleston, 271 S.C. 339, 247 S.E.2d 342 (1978). The Karesh decision required the City to restructure its financing for the project and it investigated and was offered an EDA Public Works Grant of $3 million.
As part of the environmental review process, the City contacted the Advisory Council on Historic Preservation concerning the project and eventually initiated the Advisory Council's "106 Process" under 36 C.F.R. Part 800 (ACHP A.R. A33). After discussions among the Advisory Council, HUD, EDA, the City, and the private developer, a Memorandum of Agreement (MOA) was executed in June 1979 by all parties (ACHP A.R. A215-268). The MOA was ratified by the Vice Chairman of the Advisory Council on July 19, 1979 (ACHP A.R. A345). The MOA, which constitutes the Advisory Council's comment under the NHPA, 36 C.F.R., § 800.6(c)(3), is a binding contractual agreement between the parties. It was incorporated into the City's SFEIS.
On January 22, 1980, the City formally applied to EDA for a $3 million grant under the Public Works and Economic Development Act (PWEDA), 42 U.S.C. § 3121, et seq. (EDA A.R. C1-103). The grant was approved on April 1, 1980 (EDA A.R. A146).
On January 28, 1980, the City and HUD signed the previously approved Grant Agreement for UDAG funding to be used for land acquisition, for street improvements and parking space, relocation, archeological studies, administrative costs and contingencies (HUD A.R. Vol. 3, 452). As one of the two conditions for release of the funds, the City was required to submit to HUD a certification that it had completed the environmental review process. The City submitted this certification on February 11, 1980 (HUD A.R. Vol. 3, 502). HUD approved the City's certification on April 30, 1980 (HUD A.R. Vol. 3, 564).

SCOPE OF CHARLESTON CENTER PROJECT
The proposed Charleston Center is to be a mixed-use project including the development of a hotel, convention facilities, parking and commercial establishments, and improvements of the adjacent street system and related infrastructure. It is to be located on 8.5 acres in the lower peninsula of the City of Charleston bordered by Market, Meeting, Hasell and King Streets. The project will include the Hasell Street garage and rehabilitation of the Meeting Street structures, the Market Street right-of-way improvements, hotel-retail space, and conference center. The City of Charleston will construct a 530 space parking garage on Meeting Street, and the garage will be screened from Meeting Street by the rehabilitated facades and front 40' of the structures numbered 209-217 and 221-231 Meeting Street. These structures will contain 33,120 square feet of commercial space. The City will acquire the necessary land south of Market Street, between King and Meeting Streets, for street widening to provide a 40' cross-section and two-way traffic. Market Street Associates will build on the Belk site a 431 room hotel and 71,740 square feet of retail space which will be located both on this site and along King Street. The hotel building will be 120' high *727 at the center and 104' high at the east and west wings. Market Street Associates will build a conference center on King Street with a banquet seating capacity of 850 people. Positive impacts of the proposed project include: (1) a significant source of permanent new jobs for low-skilled and unskilled persons; (2) an increase in tax revenues for the City; and (3) an increase in economic activity in the downtown area due to the creation of a link between King Street stores and the Market area. Negative impacts of the proposed project include: (1) the relocation of 25 businesses and two residences; (2) the full and/or partial demolition of several existing buildings of historic/architectural importance; (3) the effect of the height of the hotel tower on the Charleston skyline; and (4) an increase of traffic on adjacent streets (SFEIS at 7, 8).

THE COMPLAINT AND SUMMARY JUDGMENT MOTIONS

COUNT I
Count I of the complaint alleges that HUD funding of the Charleston Center Project violates the HCDA, 42 U.S.C. § 5301, et seq., and HUD's implementing regulations, 24 C.F.R. § 570.200, et seq., because the project is ineligible for funding and because the City failed to meet certain UDAG program procedural requirements. Plaintiffs contend that a UDAG grant may not be made unless the grant application describes a program designed to meet each of the conditions specified in 42 U.S.C. § 5304(a)(3), including "eliminat[ing] or prevent[ing] slums, blight and deterioration where such conditions or needs exist." 42 U.S.C. § 5304(a)(3)(A). They further argue that the City of Charleston cannot meet this particular requirement because the Supreme Court of South Carolina held in Karesh v. City Council of Charleston, 271 S.C. 339, 247 S.E.2d 342 (1978), that the area in which the Charleston Center project is to be built is not "a slum or blighted area." The Supreme Court in Karesh stated that the trial judge had made a finding that the city block in question was not a slum or blighted area, therefore, the Court held that it was error for him to hold that an Article of the South Carolina Constitution offered an additional sustaining ground for the City's position that it was condemning this property for public use. Id. at 345, 247 S.E.2d at 345. The Supreme Court itself made no particular determination with regard to the issue of whether or not this area along Meeting Street is a slum or blighted area. Furthermore, the court notes that the language of 42 U.S.C. § 5304(a)(3)(A) states that a UDAG application must describe a program to "eliminate or prevent slums, blight and deterioration where such conditions or needs exist." (emphasis added). Therefore, the existence of slums or blight is not a prerequisite to a UDAG application. However, if such conditions exist, the applicant must describe a program designed to eliminate them.
HUD has promulgated regulations set forth at 24 C.F.R. § 570.200, et seq., and § 570.450, et seq., which establish criteria for determining the eligibility and selection of applicants under the HCDA and setting forth activities eligible for UDAG funding. The Grant Agreement for the City of Charleston awards funds for seven uses: (1) land acquisition to widen Market Street; (2) street improvements; (3) land acquisition for construction of a public parking garage; (4) relocation of persons and businesses affected by the land acquisition; (5) archeological studies of the site during construction; (6) administrative costs; and (7) contingencies. (HUD A.R. Vol. 3, 495). A thorough review of HUD's regulations reveal that HUD awarded the funds for activities that are clearly eligible for UDAG funding. UDAG funds may be used for street improvements and parking facilities specifically. See 24 C.F.R. § 570.201(c)(7) and (9). The grants may also be utilized for relocation assistance for individual families and businesses displaced by activities under Part 570. See 24 C.F.R. § 570.201(i). Payment of reasonable administrative costs and contingencies is clearly authorized under 24 C.F.R. § 570.206 and included among these costs are the costs of environmental studies *728 including archeological studies. See 24 C.F.R. § 570.206(h). Although it is clear from the Grant Agreement that no UDAG funds are to be used for the construction of any of the convention facilities (HUD A.R. Vol. 3, 496), the plaintiffs contend that construction of facilities, such as convention centers, and public works and site improvements to facilitate such projects are specifically deemed ineligible for funding under 24 C.F.R. § 570.207. Therefore, the plaintiffs argue that the grant of UDAG funds to the City of Charleston is inconsistent and in violation of HUD regulations. This court agrees that the construction of a "convention center" is presumptively ineligible for UDAG funding under 24 C.F.R. § 570.207(a)(2)(i); however, the court does not interpret that regulation as rendering ineligible public works and site improvements to facilitate such projects. Furthermore, the court notes that eligible activities may be a part of a broader project that may contain ineligible activities without converting the eligible activities to ineligible. See 24 C.F.R. § 570.200(d). Specifically, this case involves a situation where the applicant can determine the cost attributable to the facility proposed for assistance as separate and distinct from the overall costs of the multiple-use building and/or facility. See 24 C.F.R. § 570.200(d)(ii).
Plaintiffs further assert in their complaint that the activities funded by HUD are ineligible because they are "inconsistent" with the CCRP and, therefore, in violation of the provision of the HCDA which requires a UDAG application to describe an Urban Development Action Program that is consistent with the Community Development Program. See 42 U.S.C. § 5318(c)(2). The CCRP is the City of Charleston's local planning document and it has been incorporated in part into the City's § 5304(a)(2) Community Development Program. The CCRP proposal for the project's site consists of a 350 room hotel, a 450 car garage, and 60,000 square feet of retail and convention space. The fact that the Charleston Center Project may be larger than the development envisioned by the CCRP does not make it inconsistent with the CCRP within the meaning of 42 U.S.C. § 5318(c)(2), since the concept of the CCRP for development of the Belk site with a hotel-convention center and retail shops is not in the least inconsistent with the Charleston Center Project. There is no requirement that the UDAG application describe an Urban Development Action Program which is "identical" with the Community Development Program.
One provision of the HCDA requires that UDAG applications must provide satisfactory assurances that prior to submission of its application the applicant has prepared and followed a written citizen participation plan, which plan provides the opportunity for citizens to participate in the development of the application. See 42 U.S.C. § 5318(c)(5)(A). In its application, the City certified to HUD that it had prepared and followed a written citizen participation plan (HUD A.R. Vol. 1, 210). A review of the Administrative Record submitted by the City of Charleston reveals that the City held more than the two required meetings prior to submission of its UDAG application. 24 C.F.R. § 570.456(c)(11)(i)(C) requires an applicant to submit a certification providing assurances that prior to its submission of its application it has held public hearings to obtain the views of citizens. One hearing must explore the needs which may be met by a grant, and another hearing must discuss the application itself prior to official action authorizing submission of the application. The City of Charleston exceeded the legal requirements for public participation by holding the two required hearings on December 1 and 19, 1977, and a special public meeting of the City Council on January 30, 1978, for review of the City's UDAG application prior to authorization for submission (City A.R. Vol. 1, 45-50). At least two of the three meetings were publicly advertised in newspapers and on radio stations and comments from the public were solicited at all three meetings (City A.R. Vol. 1, 42-50). Appendix A to the DEIS indicates that the Charleston Center Project and the UDAG funding for the project were discussed at numerous other *729 meetings, many of which were open to the public (City A.R. Vol. 3, 52a). As early as September 16, 1977, plaintiff Preservation Society of Charleston was invited to review the proposed design of the Charleston Center Project (City A.R. Vol. 3, 52a). Appendix A to the DEIS reveals that representatives of the Preservation Society of Charleston commented on the Charleston Center Project before the Board of Architectural Review, the City Council, and at other City-sponsored meetings. On December 5, 1977, City officials and the private developer of the Charleston Center held a meeting with plaintiff Preservation Society of Charleston in an effort to solicit the Society's views on the project. This court's review of the Administrative Record reveals not only that the City complied with the requirements of 42 U.S.C. § 5318(c)(5) and 24 C.F.R. § 570.456(c)(11)(i)(C), but also generated extensive public involvement in the development of the City of Charleston's UDAG application prior to its submission to HUD.
Plaintiffs also allege in Count I that the City failed to include in its UDAG application a housing assistance plan as required by 42 U.S.C. § 5304(a)(4) and 24 C.F.R. § 570.456(c)(2). The applicable regulation states that an application for a UDAG grant must contain "[a] community development plan and a housing assistance plan . . . Applicants which have an approved Community Development program in effect may incorporate this information by reference." 24 C.F.R. § 570.456(c)(2). A review of the City's Administrative Record evidences that when it filed its UDAG application in January 1978, it incorporated by reference in that application its Community Development Program and Housing Assistance Plan previously filed with HUD on March 14, 1977. (City A.R. Vol. 1, 37; City's CDBG application filed March 14, 1977).
The plaintiffs' final allegation in Count I of their complaint is that the City's UDAG application did not contain a "neighborhood impact statement" as required by 42 U.S.C. § 5318(c)(6), and therefore the Secretary's approval of the application was arbitrary, capricious, and in violation of federal law. The record establishes that the City submitted its application to HUD on January 30, 1978, and that it was approved during the spring of 1978. 42 U.S.C. § 5318(c)(6) was not enacted at that time but was added with the 1978 amendments on October 1, 1978. Therefore, at the time that the City submitted its application to HUD, it was not required under the statute to file a neighborhood impact statement. However, the City's application did include a discussion of the impact of the proposed project on the residents, particularly those of low and moderate income, of the residential neighborhood as required by 42 U.S.C. § 5318(c)(6). (City A.R. Vol. 1, 37).

COUNT II
In Count II of the complaint the plaintiffs complain that the Secretary of HUD and the Administrator for Economic Development improperly delegated their responsibilities for environmental review of the proposed Charleston Center Project, as required by the NEPA, 42 U.S.C. § 4321, et seq. The grant for the Charleston Center Project was made pursuant to the Housing and Community Development Act of 1974 (HCDA) found at 42 U.S.C. § 5301, et seq. One provision of that Act, 42 U.S.C. § 5304(h), authorizes a procedure under which applicants assume environmental review for compliance with the NEPA. That provision provides inter alia:
In order to assure that the policies of the National Environmental Policy Act of 1969 and other provisions of law which further the purposes of such Act are most effectively implemented in connection with the expenditure of funds under this title, and to assure to the public undiminished protection of the environment, the Secretary, in lieu of the environmental protection procedures otherwise applicable, may under regulations provide for the release of funds for particular projects to applicants who assume all of the responsibilities for environmental review, . . .. (emphasis added).
*730 The plaintiffs concede that the language and legislative history of § 5304(h) of the HCDA indicates that Congress did intend to authorize delegation of NEPA responsibility with regard to the Community Development Block Grant Program (CDBG). However, they argue that the delegation provision of the HCDA was not intended to apply to UDAG grants. It is clear both from the language of the delegation provision and the legislative history that applicants under HCDA are to assume the environmental review responsibility of the Secretary of HUD. Courts that have interpreted § 5304(h) of the HCDA have determined that that provision specifically authorizes the Secretary of HUD to delegate his environmental review responsibilities and to promulgate regulations to replace NEPA's environmental review requirements which would otherwise be applicable. See Monarch Chemical Works, Inc. v. Exon, 466 F.Supp. 639 (D.C.Neb.1979); Ulster County community Action Committee, Inc. v. Koenig, 402 F.Supp. 986 (S.D.N.Y. 1975).
The plaintiffs assert that § 5304(h) of the HCDA does not apply to UDAG grants. In support of this argument they state that when the NEPA delegation provision, § 5304(h), was adopted in 1974, the only grant available under the HCDA was the CDBG grant. UDAG grants were later provided for in the 1977 amendments to the HCDA. The plaintiffs argue that when the UDAG grants were added in 1977, one particular provision of the HCDA, § 5304(a), was amended to reflect the new grants in addition to the CDBG grants. However, they note that the delegation provision, § 5304(h), was not amended to provide specifically for delegation of environmental review in the case of a UDAG grant. A careful reading of the delegation provision reveals that such an amendment was unnecessary because of the language of the provision which reads "expenditures of funds under this title." The most logical interpretation of this phrase is that it was intended to make the delegation provision applicable to both CDBG grants, which were in existence at the time of the implementation of the Act, plus any future funding that might come under the HCDA, such as the UDAG grants. This interpretation is supported by the legislative history of the original Act and the 1977 amendments thereto. When Title I of the HCDA was originally enacted in 1974, Congress created three sources of federal funds: the Community Development Block Grant (CDBG), Small Cities Program, and a special Discretionary Fund. Because federal financial assistance to urban communities had previously been done piecemeal through several separate programs and was not accomplishing the needed results, Congress combined those programs into one Act, simplified the process greatly, and shifted much of the responsibility from the federal government to the local communities. Conf. Rep. No. 93-1279, 93d Cong., 2d Sess. 1 (1974), reprinted in [1974] U.S.Code Cong. & Admin.News p. 4449, et seq. The bill was enacted with a three-year authorization and the Secretary of HUD was required to report to Congress on the effectiveness of the Act in 1977. Congress recognized that there would be extensive changes in the program at the time of its reauthorization. H.R.Rep. No. 95-236, 95th Cong., 1st Sess. (1977), reprinted in [1977] U.S.Code Cong. & Admin.News pp. 2884, 2885.
When a program was reauthorized in 1977, Congress created an additional program  the UDAG. When § 5304(h) was created in 1974, it applied to all three of the grants previously mentioned, it did not differentiate between the entitlement program and the Discretionary Fund, and the phrase "expenditures of funds under this title" was utilized in the delegation provision. Consequently, when a new funding program was added in 1977, the UDAG, it was unnecessary for Congress to amend the delegation provision in order to provide specifically for the UDAG since all funds were under Title I of the HCDA. The court notes that Congress did not specifically exclude the UDAG funds from the delegation provision and it recognizes the general rule governing the construction of statutory amendments that "provisions introduced by the amendatory Act should be read together *731 with the provisions of the original section . . . left unchanged thereby, as if they had been originally enacted as one statute." Kirchner v. Kansas Turnpike Authority, 336 F.2d 222, 230 (10th Cir. 1964); See also 1A C. D. Sands, Southerland Statutory Construction, §§ 22.34-35 (4th ed. 1972).
This court finds that the delegation provision of § 5304(h) of the HCDA applies to all funds under Title I of the HCDA, including UDAG grants. Another district court has discussed the interplay of HCDA and NEPA in connection with a UDAG grant applicant. The court in Colony Federal Savings & Loan Ass'n v. Harris, 482 F.Supp. 296 (W.D.Pa. 1980), stated that the HCDA makes very clear that NEPA duties are transferred from the federal agency to the grant applicant. Id. at 302. In discussing federal officials' responsibilities to review and evaluate the environmental review completed by grant applicants under HCDA, § 5304(h), the court stated:
. . . [N]either HUD nor its Secretary had a legal obligation under NEPA to prepare a separate environmental impact statement; nor did they have a duty to critically evaluate the substance of the environmental analysis prepared by the County as a grant applicant under the HCDA. However, the federal defendants did have a duty under the HCDA, 42 U.S.C. § 5304(c)(3), and the APA, 5 U.S.C. § 706(2)(B), (c), to review the grant applicant to see that procedural requirements were met and that applicable federal regulations were followed.
482 F.Supp. at 304.
In view of the foregoing, this court concludes that the Secretary of HUD properly delegated his responsibilities under the NEPA to the City of Charleston as the applicant of a UDAG grant. The provision which allows such delegation is contained in 42 U.S.C. § 5304(h). That provision not only allows delegation of responsibilities by the Secretary of HUD to the applicant, but also requires the Chief Executive Officer of the applicant to assume the status of the Secretary of HUD for purposes of compliance with NEPA. That same statutory provision requires an applicant to accompany a request for release of funds with a certification which states, in part, that the applicant has fully carried out its responsibilities under the NEPA and that he consents to assume the status of the Secretary of HUD. The Secretary's approval of such certification is deemed by the statute to have satisfied his responsibilities under the NEPA. Therefore, the scheme of this statutory provision allows an applicant to assume the responsibilities of the Secretary of HUD for the purposes of preparing an EIS, conducting all relevant studies, considering all reasonable alternatives, and in general preparing an EIS which adequately discusses the environmental effects and alternatives of the proposed project. Furthermore, once the applicant certifies that it has, in fact, carried out all of the necessary responsibilities in compliance with NEPA, the Secretary of HUD is also deemed to have satisfied all of his responsibilities under that Act. Accordingly, the actual review by HUD is limited to a determination that the applicant has followed all of the procedural requirements of the CEQ guidelines and the regulations found at 24 C.F.R. Part 58, in conducting its environmental review. See 42 U.S.C. § 5304(c)(3); 5 U.S.C. § 706(2)(B), (C).
In this case the City initially approached HUD for funding. After determining that the City was eligible to receive UDAG funds and approving the City's grant application, HUD applied § 5304(h) of the HCDA and its regulations and allowed the City to undertake its environmental review. Accordingly, the City began preparation of its DEIS. The EDA did not become involved in this case until after the Supreme Court's decision in Karesh in late August of 1978. Sometime thereafter, the City approached the EDA seeking money under the Public Works and Economic Development Act (PWEDA), 42 U.S.C. § 3121 et seq., in order to help build a parking facility associated with the Charleston Center Project. 24 C.F.R. § 58.27 provides that when a project is to be jointly funded by one or more federal agencies other than HUD and the *732 preparation of an EIS is required, a single agency, either the applicant or the other federal agency, should assume responsibility as the "lead agency" for the preparation and clearance of an EIS, with the other agencies providing assistance.
The CEQ regulations list certain factors that two agencies involved in the same or related actions consider in order to determine which of them is to be the "lead agency" for the purposes of NEPA. These are (1) the magnitude of each agency's involvement; (2) each agency's project approval authority; (3) each agency's expertise concerning the action's environmental effects; (4) the duration of each agency's involvement; and (5) the sequence of the agency's involvement. 40 C.F.R. § 1501.5(c). As a result of the consideration of the above factors, HUD was designated as the "lead agency" under 24 C.F.R. § 58.27. EDA was designated a "cooperating agency" for purposes of NEPA compliance, and the City of Charleston, through HUD, by operation of § 5304(h) of the HCDA, was designated the "lead agency". As a "cooperating agency", EDA assumed a role of review and assistance. See 40 C.F.R. § 1501.6. A thorough review of the EDA Administrative Record establishes that the Administrator for Economic Development did not delegate his responsibilities under the NEPA to the City of Charleston; rather, the Administrative Record is replete with documents establishing that the City's Final EIS and Supplement to the Final EIS were critically and thoroughly analyzed by EDA officials. EDA staff members visited the proposed site, attended and participated in several public hearings on the proposed project, suggested revisions of the EIS and propounded specific questions to the City of Charleston concerning the Final EIS. (EDA A. R., C704; B2810-21). EDA's decision making process is set forth in a 22-page memorandum to the Assistant Secretary from the Special Assistant for the Environment. (EDA A. R., A3-25). This memorandum discusses the expected employment and economic benefits of the Charleston Center Project, both the environmental benefits and adverse effects of the project, and the alternatives to the project. It is clear from reviewing the EDA Administrative Record that the Administrator for Economic Development thoroughly considered the environmental impacts of the Charleston Center Project in accordance with his requirements under the NEPA.

COUNT III
In Count III of the complaint, the plaintiffs attack the adequacy of the EIS filed by the City of Charleston concerning the Charleston Center Project. The plaintiffs allege that the EIS's failure to include certain necessary information is a violation of NEPA, 42 U.S.C. § 4321, et seq., and is not in compliance with the CEQ guidelines contained in 40 C.F.R. Part 1500. The plaintiffs' complaint contains twenty-six paragraphs which attack the adequacy of the City's EIS. The allegations contained in these paragraphs can be summarized into four basic issues: (1) the City failed to consider all reasonable alternatives to the proposed Charleston Center Project; (2) there was an inadequate consideration of the alternatives that were contained in the EIS; (3) there was an inadequate consideration of the environmental impacts of the proposed Charleston Center Project; and (4) the City did not prepare the EIS in good faith.
The NEPA requires an EIS to discuss (1) the environmental impact of the proposed action; (2) any adverse environmental effects which cannot be avoided should the proposal be implemented; (3) alternatives to the proposed action; (4) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and (5) any reversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. 42 U.S.C. § 4332(2)(C)(i-v). The Council on Environmental Quality (CEQ), the agency charged with interpreting NEPA's provisions, has set forth in its regulations the format which it recommends for agencies to utilize in preparing their EIS's *733 in order to meet NEPA's requirements. 40 C.F.R. § 1502.10 states that an EIS should clearly address (1) the purpose and need for the proposed action; (2) the alternatives, including the proposed action; (3) a description of the affected environment; and (4) the environmental consequences of the proposed activity. In discussing the purpose of an EIS, the CEQ has stated:
It [EIS] shall provide full and fair discussion of significant environmental impacts and shall inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment. Agencies shall focus on significant environmental issues and alternatives and shall reduce paper work and the accumulation of extraneous background data. Statements shall be concise, clear and to the point and shall be supported by evidence that the agency has made the necessary environmental analysis.
40 C.F.R. § 1502.1.
The Final EIS (SFEIS) submitted by the City of Charleston in this case is 571 pages in length. The main text is divided into ten divisions which describe (1) a summary of the EIS; (2) the purpose and need for the proposed action; (3) an analysis of the alternatives to the proposed project; (4) the affected environment; (5) the probable impact of the proposed action and alternatives with regard to the physical environment, the social and economic characteristics, and the aesthetics; (6) measures to mitigate environmental impacts; (7) irreversible and irretrievable commitments of resources; (8) short-term uses of the environment versus long-term productivity; (9) responses to comments on the FEIS; and (10) a list of preparers of the SFEIS.
The plaintiffs contend that the SFEIS prepared by the City in connection with its environmental review of the proposed Charleston Center Project does not include a statement of negative environmental effects that cannot be avoided should the proposed project be implemented. The SFEIS contains a discussion of the irreversible and irretrievable commitments of resources should the proposed project be implemented. (City A. R. Vol. 6, 281-82). The SFEIS also discusses the short-term uses of the environment versus long-term productivity, including an analysis of short-term effects during the construction of the proposed project and four to five years afterward and an analysis of long-term effects which relate to operation of the action throughout its life. (City A. R. Vol. 6, 283-86). Furthermore, the unavoidable adverse impacts of the proposed project on traffic, noise, historic structures and other aspects of the environment are identified in the comparison of the proposed action with the alternative proposals. (City A. R. Vol. 6, 166-280). The CEQ regulations provide that the discussion of unavoidable adverse impacts as required by 42 U.S.C. § 4332(2)(C)(ii), should not duplicate discussions included in the comparisons of the proposed action and alternatives. See 40 C.F.R. § 1502.16.
The plaintiffs also complain that the SFEIS does not include a discussion of all "reasonable" alternatives to the proposed project. Specifically, they contend that the City in the SFEIS should have considered as alternatives the CCRP proposal, a hotel near Gaillard Auditorium, the adaptive reuse of existing buildings, a shorter hotel on the Belk site, a motel on the Belk site, a department store on the Belk site, non-structural and non-site specific alternatives that would achieve the purposes of the proposed action, and combinations of the foregoing and other appropriate alternatives. 42 U.S.C. § 4332(2)(C)(iii) requires an EIS to include a detailed statement on alternatives to the proposed action. Courts that have considered this particular statutory provision construe it as being subject to a construction of "reasonableness". See Coalition for Responsible Regional Development v. Coleman, 555 F.2d 398 (4th Cir. 1977); Appalachian Power Co. v. Train, 545 F.2d 1351 (4th Cir. 1976); Fayetteville Area Chamber of Commerce v. Volpe, 515 F.2d 1021 (4th Cir. 1975). As the Supreme Court in Vermont Yankee Nuclear Power Corp. v. *734 Natural Resources Defense Council, Inc., 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), stated:
Common sense also teaches us that the "detailed statement of alternatives" cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man. Time and resources are simply too limited to hold that an impact statement fails because the agency failed to ferret out every possible alternative, regardless of how uncommon or unknown that alternative may have been at the time the project was approved.
Id. at 551, 98 S.Ct. at 1215.
The Fourth Circuit, in Fayetteville Area Chamber of Commerce v. Volpe, 515 F.2d 1021 (4th Cir. 1975), discussed its interpretation of 42 U.S.C. § 4332(2)(C)(iii), and stated that the provision "demands the study, development and description of reasonable alternatives . . . realistic alternatives that will be reasonably available within the time the decision-making official intends to act." Id. at 1027, citing Environmental Defense Fund, Inc. v. Corps of Engineers, 470 F.2d 289 (8th Cir. 1972), and Movement Against Destruction v. Volpe, 361 F.Supp. 1360 (D.Md.1973), aff'd per curiam, 500 F.2d 29 (4th Cir. 1974).
With these principles in mind, the court now turns its attention to the alternatives proposed by the plaintiffs which they contend should have been included in the City's SFEIS. The plaintiffs complain that the hotel-convention center concept described in the CCRP should have been included in the SFEIS as a reasonable alternative project. The CCRP proposal for the Belk site was a concept suggesting possible land use, and the site structure was described in only one paragraph at page 23 of the Lower King Street District CCRP Plan. (City A.R. Vol. 12, 510). The description in that paragraph is of a major hotel of 350 rooms and a parking garage of 450 spaces. In addition, there is a retailing and convention center facility two stories high, which contains 30,000 square feet of retailing facilities on the first floor and 30,000 square feet of convention facilities on the second floor. Alternative B discussed in the SFEIS is very similar to the site structure briefly described in the CCRP. Alternative B proposed a development of a 350 to 400 room hotel, approximately 30,000 to 40,000 square feet of convention/meeting facilities, approximately 50,000 square feet of commercial space, and a 450 space parking garage. (City A.R. Vol. 6, 61). The plaintiffs contend that Alternative B and the site structure proposed in the CCRP are so significantly different that the CCRP proposal was never actually considered as an alternative in the SFEIS. Specifically, the plaintiffs argue that the CCRP did not envision the destruction or relocation of any buildings, while Alternative B is described in the SFEIS as involving the partial demolition of the rear of three historic buildings on Meeting Street and the relocation of the Dumas building. Further, Alternative B involves the widening of Market Street between King and Meeting Streets while the CCRP envisioned that Market Street would be widened only at the point where it meets King Street. This court agrees with the statement in the SFEIS that Alternative B is essentially an expression of the concept recommended as part of the CCRP. Recognizing that the CCRP proposal was just that  a concept, the court finds that the land use described in Alternative B and the structure itself are completely in keeping with the CCRP proposal. Therefore, it is this court's opinion that the CCRP proposal was, in fact, considered as an alternative in the SFEIS.
The remaining six alternatives proposed by the plaintiffs in their complaint, with the exception of one, were either considered for possible status as a reasonable alternative or were, in fact, considered as a reasonable alternative. The adaptive reuse and rehabilitation of existing structures, such as the Francis Marion Hotel and the Sears Department Store, was considered by the City in the SFEIS and rejected because it did not have market support without prior development of the proposed Charleston Center Project and, therefore, would not *735 serve as an alternative to the proposed action. A shorter hotel and/or motel on the Belk site was considered and rejected as being inconsistent with the CCRP. The alternative of a department store on the Belk site was rejected because it did not have identifiable market support. The remaining alternative, a non-structural and non-site specific alternative that would achieve the purposes of the proposed action, is so vague that no decision-maker would know how or where to begin an analysis, either environmental or economic; and there is no evidence that any such proposal would advance the development goals identified for the community in the CCRP.
The SFEIS considered eleven possible alternatives and rejected five of those for further discussion as "reasonable" alternatives. Three criteria were advanced in the SFEIS for the determination by the City of "reasonableness" in consideration of an alternative: (1) a reasonable alternative is one generally consistent with the objective and guidelines established by the CCRP; (2) development alternatives proposed should have identifiable market support for each of its components; and (3) development alternatives proposed should be easily implemented and financed. (City A.R. Vol. 6, 56). The plaintiffs summarily reject these criteria without satisfactorily explaining their deficiencies. The plaintiffs argue that the stated goal of the proposed action is to revitalize Charleston's central business district and that alternatives should be identified on the basis of whether or not they would help to attain that goal. The first criteria utilized by the City in considering alternatives is whether or not an alternative is consistent with the goals established by the CCRP. The CCRP was originally funded in 1975 in order to recommend development projects which would revitalize the central city. Therefore, one specific goal of the CCRP was to revitalize Charleston's central business district, precisely what the plaintiffs argue an established criteria should be. The plaintiffs fail to adequately explain why the other two criteria are not proper and the court is unable to determine any reason why they are not satisfactory criteria.
This court has read the SFEIS and finds it contains the study, development and description of reasonable alternatives as required by 42 U.S.C. § 4332(2)(C)(iii). We agree with the court in Fayetteville Area Chamber of Commerce v. Volpe, 515 F.2d 1021 (4th Cir. 1975), when it stated:
[A]n infinite variety of alternatives is permissible in almost every administrative decision of this nature, which should be especially true here when it is considered that the administrative authorities have considered a "do nothing" alternative. . . . So long as there are unexplored and undiscussed alternatives that inventive minds can suggest, without a rule of reason, it will be technically impossible to prepare a literally correct environmental impact statement . . .
Id. at 1027. In finding that the SFEIS complies with the requirements of § 4332(2)(C)(iii), this court applies a rule of reason and notes that all alternatives proposed by the plaintiffs, with the exception of one, were discussed in the SFEIS and either rejected as "reasonable" alternatives based upon valid criteria or were included in the SFEIS's discussion of "reasonable" alternatives. The SFEIS's discussion of alternatives, although not exhaustive, is highly reasonable and certainly adequate to present the decision-maker, the City, with enough options to make a reasonable decision as to whether or not to proceed with the proposed project.
Plaintiffs further allege in Count III that the City of Charleston, in the SFEIS, failed to consider means of mitigating the environmental impact of the proposed action. Such a claim is demonstrably false since the SFEIS contains a discussion of measures to mitigate the environmental impact of the proposed action and the five alternatives. (City A.R. Vol. 5, 268-80).
It is the further contention of the plaintiffs that the SFEIS is deficient because it fails to consider potentially significant environmental impacts of the proposed *736 action with regard to impacts on residential neighborhoods near the project, traffic impacts, noise impacts, impacts on the air quality and the impacts of the proposed action on the "urban design" of the historic district. This court's reading and review of the SFEIS reveals that it discusses each and every alleged deficiency cited by the plaintiff. The SFEIS discusses the impact that is likely to occur as a result of the proposed project on each of the components of the City's existing physical environment. As necessity dictates, the impacts are discussed separately for each of the five major alternatives and the SFEIS discusses, in particular, the impacts of the proposed project on traffic, public transportation and parking, land use, air quality and noise levels. (City A.R. Vol. 6, 166-214). The SFEIS also discusses the impacts of the proposed project on the City's social and economic characteristics. (City A.R. Vol. 6, 215-230). The effect of the project on historical structures in the area is discussed building by building. (City A.R. Vol. 6, 231-39). Furthermore, the SFEIS incorporates the Memorandum of Agreement which was developed and executed pursuant to the NHPA and the regulations of the Advisory Council. The MOA explores reasonable alternatives and establishes measures to mitigate any adverse effects which the project might have on the historic properties, including design changes, in order to bring the project into proper scale with the surrounding structures. The MOA also contains measures to insure that the design and construction of the project conform to the Agreement. The SFEIS also discusses the cultural, architectural and archeological impacts, and particularly the site's relationship under the proposed action to its environs. (City A.R. Vol. 6, 231-41).
The SFEIS recognizes quite clearly that the proposed action will bring an increased density of people and traffic to the area and that these impacts may be felt in the residential neighborhoods near the Charleston Center. It is noted in the SFEIS that the increased tourism may cause congestion and other problems to the historical residential area that may alter the character of the residential neighborhoods and that increased vehicular and pedestrian traffic which generates congestion and noise may affect the quality of life in the residential area. (City A.R. Vol. 6, 215). The plaintiffs fault the SFEIS because it contains no detailed discussion of the extent of these impacts and how they will affect the daily lives of the residents of the surrounding neighborhoods. The court notes that the impacts on the residential neighborhoods are identified in the SFEIS and that it would be impossible for it to contain a further discussion of how the impacts will affect each resident's life since that would require an examination of the mental status of each particular resident. The SFEIS clearly recognizes that the proposed action will have certain impacts on the surrounding neighborhoods, and it discusses measures which are to be implemented in order to mitigate these impacts. For example, new parking regulations in neighborhood areas, encouragement of pedestrian tours, and improved public transportation are planned in an effort to reduce the adverse impact of the proposed action. (City A.R. Vol. 6, 271-73).
The SFEIS's discussion of the impact of the Charleston Center on traffic in the peninsula is based on a 1982 estimate of projected traffic increases derived from 1978 conditions. In estimating the traffic increases in 1982, new and proposed developments in the vicinity of the Belk site were also considered. Specifically added to the 1980 estimate was cumulative traffic impact resulting from the Meeting Street Office Building, the surface lot behind the building, the Cumberland Street Garage, and the new surface parking lot between King and Meeting Streets. (City A.R. Vol. 6, 87-89). Further, an analysis of 1990 traffic conditions was included in the SFEIS. (City A.R. Vol. 6, 186-89).
With regard to the plaintiffs' contentions concerning air quality and the impact on it by the Charleston Center, the court notes that the City has obtained a certification from the Environmental Protection Agency which finds the EIS to be satisfactory under *737 § 309 of the Clean Air Act. (City A.R. Vol. 8, 329).
The plaintiffs also allege that the City in the SFEIS has failed to discuss the relationship of the proposed Charleston Center to existing land use plans as required by the CEQ regulations. As the plaintiffs note, the CCRP constitutes an official local development plan and sets forth land use policies adopted by the City. Consequently, the plaintiffs argue that the CEQ regulations require the City to discuss possible conflicts between the proposed project and the CCRP and to discuss the extent to which the City would reconcile these conflicts. In the SFEIS the City states that the proposed Charleston Center is in accordance with the CCRP proposal for development of the Belk site. (City A.R. Vol. 6, 11). The City has maintained throughout this litigation that the proposed development of the Belk site contained in the CCRP is consistent with the proposed Charleston Center Project and the court agrees with the City's position. In any event, the City has discussed in the SFEIS the relationship of the proposed project to existing land use plans as contained in the CCRP. (Id.)
Plaintiffs further contend that the City has failed to prepare a record of decision as required by CEQ regulations which became effective November 30, 1979. Under these new regulations, whenever an agency prepares an EIS it must also, at the time that it makes its final decision under the NEPA, create a "record of decision" that explains its decision. See 40 C.F.R. § 1505.2. This court's reading of 40 C.F.R. § 1506.12 establishes that the CEQ declined to mandatorily require application of the new regulations to ongoing activities or to supplementary EIS's if the Draft EIS was filed before July 30, 1979. However, the regulations state that they should be applied "to the fullest extent practicable to ongoing activities and environmental documents before the effective date." 40 C.F.R. § 1506.12(a). The SFEIS, the document which the City considers to be its Final EIS, was issued on September 14, 1979, more than two months prior to the effective date of the new CEQ regulations. Whether or not it was practicable for the City as the "lead agency" to have prepared a record of decision more than two months after submitting its Final EIS is a question to be determined at the administrative level. In any event, CEQ guidelines are merely advisory and not mandatory. See Upper Westfork River Watershed Ass'n v. Corps of Engineers, 414 F.Supp. 908 (N.D.W.Va. 1976), aff'd, 556 F.2d 576 (4th Cir. 1976), cert. denied, 434 U.S. 1010, 98 S.Ct. 720, 54 L.Ed.2d 752; Hiram Clarke Civic Club, Inc. v. Lynn, 476 F.2d 421 (5th Cir. 1973).
The NEPA requires an EIS to discuss certain factors. See 42 U.S.C. § 4332(2)(C)(i-v). The SFEIS submitted by the City of Charleston contains a discussion of all relevant factors as required by the NEPA. The legal test for determining the adequacy of a discussion of the necessary factors is one which examines whether or not the subject EIS is one which will provide the decision-makers with sufficient information of the environmental consequences of their action so that they can make a reasoned decision. See Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); Sierra Club v. Morton, 510 F.2d 813 (5th Cir. 1975). Those opposing the agency action on NEPA grounds must advance evidence which is substantial and dependable to prove that an EIS is fatally flawed or a NEPA complaint will not withstand a motion for summary judgment. Upper Westfork River Watershed Ass'n v. Corps of Engineers, 414 F.Supp. at 922. This burden is not met by merely establishing a prima facie showing of deficiencies. Conservation Council of North Carolina v. Froehlke, 435 F.Supp. 775, 791 (M.D.N.C.1977). In reviewing the adequacy of an EIS as part of the record before the decision-makers in a NEPA case, the district court's sole role is to insure that the sponsoring agencies have considered the environmental consequences of the proposed action. Strycker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 227, 100 S.Ct. 497, 500, 62 L.Ed.2d *738 433 (1980). The EIS, as part of the administrative record, must evidence to the court that there was adequate discussion and information provided such that the decision-maker could make a reasoned decision concerning the proposed action.
Finally, in Count III of the complaint, the plaintiffs allege that the City's preparation of the EIS was not conducted in good faith because it constituted a post hoc effort on the City's part to rationalize a decision to proceed with the proposed project without regard to the environmental consequences and without regard to the existence of any alternatives that might serve the City's revitalization goals without causing the negative environmental effects that will result from the implementation of the proposed action. The Fourth Circuit has stated that the test of compliance with § 102 of the NEPA, 42 U.S.C. § 4332, is one of good faith objectivity rather than subjective impartiality. See Fayetteville Area Chamber of Commerce v. Volpe, 515 F.2d 1021 (4th Cir. 1975); see also Life of the Land v. Brinegar, 485 F.2d 460 (9th Cir. 1973); Environmental Defense Fund v. Corps of Engineers, 470 F.2d 289 (8th Cir. 1972). Nothing in the record before this court suggests other than good faith objectivity on the part of any official, local or federal, in the preparation and review of the Environmental Impact Statement. The fact that these officials have come to different conclusions than the plaintiffs desire is no reason to upset their decision. The Administrative Record in this case is replete with evidence that the responsible federal officials involved themselves in the review of the Charleston Center Project to a great extent. They attended meetings both in Charleston and Washington; they reviewed the various EIS's submitted by the City; they made comments on those EIS's; they suggested changes in the EIS's; and they reviewed the Final EIS with concerned objectivity toward the environmental consequences of the proposed action. See e. g. HUD A.R. Vol. 2, 333, 360; Vol. 3, 419; EDA A.R., C704-05, B2810-11; ACHP A.R. Vol. 2, 345.
A full study of the EIS and the entirety of the record clearly establish that the potential environmental impacts of the Charleston Center Project were thoroughly revealed and discussed and that the bases for the various conclusions in the EIS are sufficiently documented. The SFEIS takes an honest and detailed approach to environmental considerations in developing the Charleston Center. The environmental sacrifices involved are noted and the reasons why alternatives were not selected are clearly stated. Particularly, the range of alternatives considered is adequate. Accordingly, the court concludes that the SFEIS is a document upon which a decision-maker could arrive at an informed determination.

COUNT IV
In Count IV of their complaint, the plaintiffs contend that the Secretary of HUD and the Administrator for Economic Development improperly delegated their historic preservation responsibilities under the NHPA to the City of Charleston, and that because of such delegation, they acted arbitrarily, capriciously, and in violation of federal law. The Advisory Council on Historic Preservation became involved in this case through a provision in the National Historic Preservation Act. That provision, 16 U.S.C. § 470f, provides that prior to any funding by a federal agency of a project which will affect property that is included in or eligible for inclusion in the National Register, that agency must consider any effect that the project will have on the property and must afford the Advisory Council on Historic Preservation an opportunity to comment with regard to the project. The NHPA authorizes the Advisory Council to promulgate regulations to guide agencies in implementing § 470f. The Advisory Council has done so, and 36 C.F.R. § 800.4 contains the necessary steps which an agency official must take in order to comply with the requirements of § 106 of the NHPA. (16 U.S.C. § 470f).
Those regulations provide that it is the primary responsibility of each agency official *739 requesting Council comment to conduct the appropriate studies and to provide the information necessary for an adequate review of the effect the proposed undertaking may have on National Register property as well as the information necessary for adequate consideration of modification or alterations to the proposed undertaking that could avoid, mitigate or minimize the adverse effect. If the agency official finds that the effect on the property is to be adverse, there are three steps which he must comply with: (1) prepare and submit a preliminary case report requesting the comments of the Council; (2) notify the State Historic Preservation Officer of this request; and (3) proceed with the consultation process set forth in § 800.6. The Advisory Council's regulations use the term "agency official" to refer to the head of a federal agency or the agency's designee responsible for allowing the Council an opportunity to comment. 36 C.F.R. § 800.2(i). Under these regulations, the "agency official," the Advisory Council, the State Historic Preservation Officer, and others consult and may develop a Memorandum of Agreement which, when ratified by the Chairman, constitutes the Advisory Council's comments binding the signatories to historic protective measures. The regulations provide that the Memorandum of Agreement constitutes the comments of the Council and shall evidence satisfaction of the federal agency's responsibilities for the proposed undertaking under § 106 of the Act. See 36 C.F.R. § 800.6(c)(3).
HUD delegated its historic preservation responsibilities under the NHPA to the City of Charleston such that Mayor Riley, as the chief executive officer of the applicant, became the responsible federal agency official under the Advisory Council's procedures. HUD's regulations provide for an applicant for HCDA Title I funds, such as the City of Charleston, to consider the criteria, standards, policies, and regulations of the NHPA in its environmental review and to be the "agency official." See 24 C.F.R. § 58.1. Applicants under the HCDA must comply with the NHPA and Executive Order 11593 whenever any property included in or eligible for inclusion in the National Register is in the boundaries or within the vicinity of a project which is to be funded under that Act. See 24 C.F.R. § 58.24. Applicants must examine the project to identify historic properties and determine if the project may affect the property. If so the applicant must carry out the Advisory Council's Part 800 regulations. See 24 C.F.R. §§ 58.24(a) and (b), 570.604.
The plaintiffs contend that the Secretary of HUD may not delegate his NHPA responsibilities under the HCDA to a grant applicant. In the 1979 amendments to the HCDA, Congress clarified HUD's authority under the original Act to allow applicants to assume not only NEPA responsibilities but also NHPA responsibilities. The phrase "and other provisions of law which further the purposes of [NEPA]" was inserted into § 104(h) of the HCDA after the references to NEPA. § 103(g) of P.L. 96-153. The committee report explains the amendment:
The conferees are aware that there has been some confusion over whether the Secretary has the authority to delegate such authority with regard to acts other than the National Environmental Policy Act of 1969 (NEPA). Specifically the conferees wish to make clear that delegation can also be made with regard to the National Historic Preservation Act of 1966, Coastal Zone Management Act of 1972, Wild and Scenic Rivers Act, Flood Disaster Protection Act and Clean Air Act as well as other acts which further the purposes of the NEPA.
Conf.Ref. No. 96-706, 96th Cong., 1st Sess. 45 (1979), reprinted in [1979] U.S.Code Cong. & Admin.News, 2402, 2403-04; See also H.Rep. No. 96-154, 96th Cong., 1st Sess. 7-8 (1979), reprinted in [1979] U.S. Code Cong. & Admin.News, 2317, 2323.
In this case HUD designated the City to be the "agency official" for purposes of the NHPA and the Advisory Council accepted its designation as proper. (ACHP A.R., A32, 33). On March 30, 1978, Mayor Riley wrote a letter to the State Historic Preservation Officer in Columbia, South Carolina, and notified him that the Charleston Center *740 Project would affect properties eligible for inclusion in the National Register and that the effect would be adverse. (ACHP A.R., 33). The City of Charleston, and specifically Mayor Riley as the responsible federal agency official, prepared and submitted a preliminary case report, which in this case was the DEIS. In the letter of March 30, 1978, he notified the SHPO of his request for comments of the Council. 36 C.F.R. § 800.6 contains the consultation process which must occur between the agency official, Mayor Riley, the SHPO, Mr. Charles Lee, and the Executive Director of the ACHP. That section provides that when an undertaking involves more than one federal agency, these agencies may coordinate their consultation responsibilities through a single "lead agency." Again, this was done through HUD as the "lead agency" and through the City of Charleston as the delegatee of HUD's responsibilities via § 5304(h) of the HCDA and the regulations promulgated thereunder. EDA, as "cooperating agency," allowed the City of Charleston, as the "lead agency," to do the necessary studies and to initiate the Memorandum of Agreement process. EDA participated in the development of the Memorandum of Agreement by attending meetings, providing comments, and assisting in the drafting of the document. The Memorandum of Agreement in this case was signed by the Executive Director of the ACHP, Mayor Riley, a representative from HUD, a representative from EDA, the South Carolina State Historic Preservation Officer, and the private developer, in June of 1979. The Memorandum of Agreement was ratified by the Vice Chairman of the ACHP on July 19, 1979. His ratification of the MOA eliminated any need for the Agreement to go to the Council for ratification. In a memorandum to the Council members, the Vice Chairman stated that he ratified the MOA only after the most thorough and careful study of the relevant documentation, the comments of hundreds of citizens and organizations, and after weighing the views of the Council members as expressed to him in their letters. (ACHP A.R., 345). Once the Memorandum of Agreement was ratified by the Vice Chairman, all of the procedural requirements of the NHPA were complied with. See 36 C.F.R. § 800.6(c)(3).
It is this court's opinion that the Secretary of HUD and the Administrator for Economic Development properly delegated their historic review responsibilities under the NHPA to the City of Charleston via 42 U.S.C. § 5304(h). Furthermore, the court finds that the City of Charleston, as the "agency official" under the NHPA, fully complied with the requirements of that Act and the regulations of the Advisory Council. (36 C.F.R. Part 800).

COUNT V
In Count V of their complaint, the plaintiffs allege that when the Secretary of HUD and the Administrator for Economic Development executed the Memorandum of Agreement, they acted arbitrarily, capriciously, and in violation of federal law. The basis for this allegation is the argument that they were under a duty to review, study, or consider alternatives that would mitigate the adverse effects of the Charleston Center Project on the Charleston Historic District, and also to prepare or review an Environmental Impact Statement which adequately addressed the adverse effects of the proposed Charleston Center Project. The court notes that the federal agencies properly coordinated their consultation responsibilities under the NHPA through the City of Charleston as the single "lead agency" official. The City of Charleston consulted with the Advisory Council, the SHPO, and members of the public at various times during 1978. (ACHP A.R., A65-66). A formal request for comment was submitted to the Advisory Council in November 1978. (ACHP A.R., A35-36). A public meeting was held in January of 1979 and representatives from the plaintiff organizations were present and heard. (ACHP A.R., A74-156). In addition to the comments presented at that meeting, the Advisory Council, the SHPO, and the City, received and considered many written comments on the project from citizens, preservation groups and others. The consulting *741 parties, the project architects, and the developer, met during the spring of 1979 to discuss the design of the project. (ACHP A.R., A172-84). During this process, the design was modified in an effort to mitigate adverse effects to historic Charleston. As a result of the consultation process, the parties entered into the Memorandum of Agreement. HUD and EDA acted properly in coordinating their activities through the City of Charleston and the resulting Memorandum of Agreement was reached only after extensive meetings and considerations of adverse effects and alternatives that would mitigate the adverse effects of the Charleston Center Project. Therefore, the plaintiffs have failed to raise any genuine issue of material fact as to Count V.

COUNT VI
Count VI of the complaint contains several allegations concerning the Advisory Council's opportunity to comment on the proposed Charleston Center Project. First, the plaintiffs assert that the Advisory Council was never provided an opportunity to comment on the undertaking nor did the Council, acting through a quorum of its members, ever comment on the project. Consequently, they assert that the failure of the Advisory Council to give full and adequate consideration to, and to provide detailed and objective comments on, the Charleston Center Project was arbitrary, capricious, an abuse of discretion, and in violation of federal law. Second, the plaintiffs argue that the execution of the Memorandum of Agreement by the Executive Director of the Advisory Council does not comply with the historic preservation responsibilities imposed on the Advisory Council by the NHPA, and any regulations which purport to authorize the Executive Director to execute a Memorandum of Agreement are arbitrary and in violation of the NHPA. The plaintiffs further contend that the Vice Chairman of the Advisory Council acted arbitrarily and capriciously and abused his discretion in failing to place the Charleston Center Project on the agenda for consideration at an Advisory Council meeting. They also argue that he failed to comply with the regulations of the Advisory Council at 36 C.F.R. § 800.6(d)(1) because he failed to notify the other Council members on July 19, 1979, that he had ratified the Memorandum of Agreement and he did not provide them with a written summary of the Charleston Center undertaking or notify them of their right to object to ratification within ten days in order to have the undertaking scheduled for consideration at a full Council meeting. As to the first allegation of Count VI, the Advisory Council's regulations clearly provide that a Memorandum of Agreement constitutes the Council's comments, and further comment by the Council is unnecessary. See 36 C.F.R. § 800.6(c)(3). In this case it is obvious that the Advisory Council was provided the opportunity to comment as required by 16 U.S.C. § 470f and did indeed comment on the Charleston Center Project through the Memorandum of Agreement. With regard to the second allegation of Count VI, the Executive Director is fully authorized under the Advisory Council's regulations to execute the Memorandum of Agreement and forward it to the Chairman for ratification. See 36 C.F.R. § 800.6(c)(1).
The plaintiffs contend that the Vice Chairman failed to comply with the regulations of the Advisory Council at 36 C.F.R. § 800.6(d)(1), and such action by the Vice Chairman was arbitrary, capricious, an abuse of discretion, and in violation of federal law. The federal defendants contend, and the court agrees, that the Vice Chairman, in ratifying the Memorandum of Agreement, did not operate under 36 C.F.R. § 800.6(d)(1) but rather proceeded under § 800.6(c)(2). According to that provision, which requires no written summary, the Chairman may place the matter on the agenda for consideration at a Council meeting. However, if he decides not to place the matter before the Council, the Agreement shall become final when he ratifies it or upon the expiration of the thirty-day review period with no action taken. In this case, the Vice Chairman complied with the regulations in that he decided not to place the matter on the agenda for consideration *742 at a Council meeting but rather decided to ratify the Memorandum of Agreement. It is evident from the record that his decision to ratify the Agreement was made only after a careful and searching consideration by him and after receiving comments which he solicited from the other Council members. (ACHP A.R., A345).
Finally, it is clear that the Advisory Council regulations do not violate the NHPA. That Act requires federal agencies to take certain actions and to afford the Advisory Council the opportunity to comment on proposed projects which will affect properties either included or eligible for inclusion in the National Register. See 16 U.S.C. § 470f. The NHPA does not specify the method of commenting and gives the Advisory Council the authority to promulgate regulations to implement § 470f. See 16 U.S.C. § 470f. The method by which the Council defines the "opportunity to comment" and promulgates the regulations in order to implement § 470f is left entirely to its discretion. The regulations found at 36 C.F.R. Part 800, establish procedures by which agencies may afford the Council the opportunity to comment as they must do under § 470f. The construction of the statute by those charged with its execution should be followed unless there are compelling indications that it is wrong. Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969). The court finds that the Advisory Council regulations are not arbitrary and do not violate the NHPA.
In their motion for summary judgment filed with this court on August 12, 1980, the plaintiffs raise an issue which was not presented in their original complaint. They contend that EDA's award of the Public Works Grant to the City of Charleston appears to have been the product of political influencing and, therefore, is invalid. Specifically, they assert that the Administrative Record evidences that Senator Ernest F. Hollings, United States Senator for the State of South Carolina, exerted undue influence and pressure upon the EDA decision-makers in order to gain their approval of the City's Public Works Grant application associated with the Charleston Center Project.
In support of this argument, they cite the cases of D. C. Federation of Civic Ass'ns v. Volpe, 459 F.2d 1231 (D.C.Cir.), cert. denied, 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972), and Texas Medical Ass'n v. Matthews, 408 F.Supp. 303 (W.D.Tex.1976). In D. C. Federation the controversial project was a bridge between the Georgetown waterfront in the District of Columbia and Spout Run in Virginia. The bridge was to have been part of the interstate highway system and would have been built largely with federal funds. It would have affected the Georgetown historic district and it would have used some parkland. A source of continuous controversy since its conception, the proposed bridge was deleted from the interstate highway system in January 1969 when the National Capital Planning Commission, the official planning body for the District, adopted a comprehensive transportation plan which did not include the Three Sisters Bridge. The bridge was redesignated part of the interstate system six months later after Representative Natcher, Chairman of the Sub-Committee on the District of Columbia of the House Appropriations Committee, publicly stated that the money for construction of the District subway system would be withheld if the bridge plan were not revived. In August 1969 the District of Columbia City Council voted to reverse its earlier position on the bridge, with the swing members loudly protesting that they would not have changed their votes except for the pressures exerted by Representative Natcher. During that same month, Transportation Secretary Volpe announced his decision that the bridge project should go ahead as part of the interstate system.
The district court found as a fact that the pressure exerted by Representative Natcher and others did have an impact on Secretary Volpe's decision to approve the bridge. The court stated:
[T]he statement issued by the Secretary at the time he directed the Federal Highway *743 Administrator to restore the bridge to the interstate system indicates that the pressure on the rapid transit fund was a consideration at that time.

316 F.Supp. 754 at 764-65 (emphasis added). The court also found on the basis of the Secretary's contemporaneous statements and his testimony before the court that the pressure regarding the rapid transit appropriations was given some consideration at the time of the approval of the project in August 1969. Id. at 766. From these factual determinations made by the district court, the D.C. Circuit Court fashioned a rule of law to the effect that an administrative decision would be invalid if based in whole, or in part, on the pressures emanating from Congressional sources. 459 F.2d at 1246. In such a situation, the district court should remand the decision to the appropriate administrative authorities in order for them to make a new determination based strictly on the merits and completely without regard to any considerations not made relevant by Congress in the applicable statutes. Id.
Adopting the rationale of D. C. Federation, the court in Texas Medical Ass'n v. Matthews, 408 F.Supp. 303 (W.D.Tex.1976) remanded its case to the Secretary of HEW after it found that HEW's action was based in part on pressures emanating from Congressional sources. Id. at 315. The plaintiffs in Texas Medical were challenging the validity of regulations promulgated by the Secretary of HEW under the Professional Standards Review Organization Statute of 1972, whereby HEW divided the State of Texas into nine PSRO areas and rejected the plaintiffs' proposal of a single statewide PSRO for Texas. The undisputed evidence before the district court was that in August 1973 HEW's Region VI office recommended a single statewide PSRO area designation for Texas. On October 14, 1973, the National Director of HEW's Office of Professional Standards Review issued a policy statement in which he said that statewide PSRO's would be considered in certain circumstances. The next day the Director repeated this policy statement and used the State of Texas as an example of a state with a statewide PSRO. Some forty-eight hours later when the OPSR Director arrived in Dallas, Texas, for a meeting with proponents of a statewide PSRO, he repudiated the October 14th/15th policy statement and announced that Texas must be divided into multiple PSRO areas and gave HEW's Region VI office orders to this effect. Evidence in the record established that in the intervening hours, the OPSR Director had met with a U. S. Senator and a senior staff member of the Senate Finance Committee and that during this meeting the Senator expressed his disapproval of the Director's October 14th/15th policy statement. There was further evidence that when HEW officials were questioned about the abrupt turn-around by the OPSR Director, they stated that he must either change his position or his job would be at stake. The record before the district court was replete with direct evidence that not only was Congressional pressure exerted on the Director of the OPSR, but also that such pressure played a considerable factor in his decision to alter his position concerning the statewide PSRO question. The district court noted that the plaintiffs had established a prima facie probability, if not certainty, that the HEW action at issue was based at least, in part, upon pressures emanating from Congressional sources. 408 F.Supp. at 312. It further stated that the evidence presented by HEW to rebut the plaintiffs' proof had been meager and unconvincing. Id.
Applying the controlling principle of law enunciated in D. C. Federation, the court finds that this case need not be remanded to the EDA for further consideration because the plaintiffs have failed to establish a prima facie probability that the EDA action at issue here was based, even in part, upon pressures emanating from Senator Hollings. In support of their position, the plaintiffs cite eight documents from the voluminous Administrative Record which they contend establish that EDA had decided to grant the City of Charleston $3 million in federal funds before the City had submitted its grant application. One of *744 these eight documents is a letter from Senator Hollings to the Editor of the Washington Post criticizing an article which appeared in that paper concerning the Charleston Center Project. Another document is a letter from the Executive Director of the ACHP to Senator Hollings in which he enclosed a press release concerning the involvement of the ACHP in the Charleston Center Project. Still another document is a letter from the Chairman of the ACHP to Senator Hollings thanking him for sending him a copy of the Senator's letter to the Washington Post. Another document is a letter from Senator Hollings to the Executive Director of the ACHP in which he voices his support of the Charleston Center and commends the ACHP for its consideration and cooperation concerning the Charleston Center Project. None of these four documents cited by the plaintiffs have anything whatsoever to do with any political pressure which may have been exerted by Senator Hollings on EDA officials in connection with the Public Works Grant to the City of Charleston.
The court now turns its attention to the four remaining documents in an effort to determine whether or not they lend any support to the plaintiffs' argument. One document is a letter from Senator Hollings to the Deputy Assistant Secretary for Operations of the EDA. In that letter he thanks the Secretary for meeting with a member of his staff and he voices his support for the Charleston Center. Another document is the Secretary's letter in response to the Senator's letter previously mentioned in which the Secretary states that he appreciates the Senator's interest in the matter and that the environmental problems are being studied by the EDA. The third document is a memorandum from one EDA official to another in which he reports about a meeting which he attended at the office of the Mayor of the City of Charleston on October 12, 1978. At that meeting the amount of a possible EDA grant was discussed and the EDA official indicates in his memorandum that it was his feeling or opinion that the Assistant Secretary of EDA had agreed to a $3 million figure rather than a $2 million figure. The final document cited by the plaintiffs is a letter dated October 18, 1978, from Mayor Riley to the Assistant Secretary of HUD which contained a statement that the City of Charleston was notified on October 17, 1978, that a $3 million EDA grant had been approved. It appears from the record that at the time Mayor Riley wrote this letter, there was discussion among the City and EDA about whether or not EDA could offer more than a $2 million grant to the City. Four days after the October 12th meeting in the Mayor's office concerning the amount of the grant, the Mayor writes to HUD that, in fact, they had received approval of a $3 million grant. The plaintiffs contend that this statement by Mayor Riley on October 18, 1978, establishes that EDA had already decided to issue and approve a $3 million Public Works Grant to the City of Charleston regardless of whether or not the City would later qualify for such a grant.
However, the plaintiffs fail to cite another document in the Administrative Record which the court finds very enlightening on this entire issue. In a memorandum dated March 30, 1979, the EDA Regional Director, Charles Oxley, stated to Robert Hall, Deputy Assistant Secretary of EDA, that the City of Charleston was authorized on October 30, 1978, to submit a grant application for the construction of a parking garage to be integrated into the Charleston Center Project. (EDA A.R., C262-63). In this memorandum Mr. Oxley states:
To date this application has not been submitted to the SERO. This office has reevaluated the economic benefits of the project in view of the apparent environmental and historical difficulties being encountered by the project and continues to feel that the EDA commitment to the City of Charleston should not be withdrawn.
He closes his memorandum by stating:
Hopefully, the City will be able to work out all the problems surrounding the project and be successful in submitting the previously authorized application in time for funding this fiscal year.
*745 It is clear to the court from this document and from other documents in the Administrative Record that the procedure of the EDA is to preliminarily authorize an application prior to any consideration of whether or not the project, itself, will ultimately meet the requirements of the applicable statutes and regulations. The City of Charleston received from EDA its preliminary authorization to submit an application in October of 1978. An informal application was submitted in August of 1979 (EDA A.R., C241), and it submitted its formal application for EDA funds in January 1980. (EDA A.R., A3).
The evidence submitted by the plaintiffs in support of their argument that Senator Hollings improperly influenced EDA in its action concerning the Public Works Grant can certainly be distinguished on its facts from the situations presented in D. C. Federation and Texas Medical. Those cases involved an actual public threat by a Congressman and actual documented evidence that an agency decision-maker was confronted with threats and political pressure which ultimately influenced his administrative decision. The record in the case before this court is absolutely devoid of any evidence of threats or pressure exerted by Senator Hollings on EDA officials. There is certainly nothing improper in Senator Hollings expressing his views and support of the Charleston Center Project to editors of newspapers and federal officials. There is also nothing improper in an elected federal official attempting to secure for his constituents a federally funded project for the area that he represents. Indeed, this is one reason why we send Representatives and Senators to the United States Congress. The district court in D. C. Federation, having before it evidence of an actual threat by a U. S. Congressman, stated that it found no improprieties or illegality in the actions of Representative Natcher and others who strongly advocate the bridge project as they were surely entitled to their own views concerning the project. 459 F.2d at 1249. Since the plaintiffs have failed to establish even a prima facie showing on this issue, the defendants are entitled to summary judgment.
In conclusion, the court would like to make some brief observations concerning the issues raised in this litigation. It appears to this court that the plaintiffs' sole concern and purpose in filing this action is simply to stop the Charleston Center Project. After carefully reviewing and considering the arguments advanced by the plaintiffs in this litigation, the court is convinced that they will always oppose any determination that the Charleston Center Project should proceed. The majority of the legal arguments advanced by the plaintiffs in this litigation have no support either statutorily or by case law. The court has painstakingly attempted to understand certain positions taken by the plaintiffs when a plain and clear reading of a statute results in their arguments being completely without merit. This court has reviewed all statutes and regulations cited by the plaintiffs in support of their arguments and finds the vast majority of them to be directly contrary to those arguments. The attacks directed at the EIS prepared by the City of Charleston, many of which lack even one scintilla of arguable support in the record, demonstrate that the plaintiffs' real complaint goes not to the adequacy of the EIS itself, but rather to the merits of developing the Charleston Center Project.
The court does not intend to appear callous with regard to the concerns of the opponents of the Charleston Center Project; however, the federal statutes involved in this litigation do not empower the courts to pass on the merits of a proposed federal project and, thereby, to politically second-guess administrative actions. Even though the plaintiffs' case necessitated a tedious and time-consuming analysis of the voluminous Administrative Record and the EIS, this court's review is a limited one. The role of the court is to review the Administrative Record, including the EIS submitted by the City of Charleston, and to determine whether or not the federal agencies have complied with the necessary procedural requirements and to insure that the federal agencies involved have considered the environmental *746 consequences of the proposed action. This court is of the opinion that the defendants in this case have met this test and are entitled to summary judgment on all counts of the plaintiffs' complaint. It is hereby,
ORDERED, that the defendants' motions for summary judgment be granted; that the plaintiffs' motion for summary judgment be denied; and that summary judgment be entered in favor of the defendants. It is further,
ORDERED, that the preliminary injunction issued by this court on May 8, 1980, be, and the same hereby is, dissolved.
AND IT IS SO ORDERED.